## A03A1105. GUIDA et al. v. LESSER et al.

(590 SE2d 140)

ADAMS, Judge.

After her 52-year-old husband's sudden death from an apparent heart attack Cynthia A. Guida, as surviving spouse of Michael J. Guida, and as administratrix of Michael J. Guida's estate, sued Laurence M. Lesser, M.D., Cardiovascular Group, P.C. (CG), and two employees of CG, Jim Zacharias and Joette Warnock, for wrongful death lodging claims for simple negligence, negligent misrepresentation, and breach of a private duty under OCGA § 51-1-8. The crux of Guida's complaint was that CG's delay in scheduling an appointment for an exercise stress test for Michael Guida caused his death.[1]

On appeal of the grant of summary judgment, this Court reviews the evidence de novo and considers the evidence and all reasonable inferences therefrom in a light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997). So viewed, the evidence shows that on August 20, 1999, Michael Guida went to his regular family physician, Dr. Gerald Adler, complaining of chest pain. Dr. Adler recommended that he continue to take antacids, but apparently an EKG was also done that day. On September 16, 1999, Michael Guida again consulted Dr. Adler. Cynthia Guida testified that "his chest pains had gotten worse, and we were both very concerned about it." On this occasion, Dr. Adler wrote two referrals, one for a stress test by Dr. Lesser and another for a sigmoidoscopy by an unspecified gastroenterologist. Cynthia Guida explained that Dr. Adler attributed the chest pain to acid reflux or a gastrointestinal problem and did not think that he needed a stress test but gave him a referral anyway.[2] She believed that Dr. Adler wrote the referrals at her husband's insistence.

The next day, Friday, September 17, Cynthia Guida telephoned CG to schedule an appointment with Dr. Lesser for the stress test. She testified that an unidentified female employee at CG told her that a referral number from her husband's insurance company was needed. Guida admitted that sometime between the twentieth and twenty-second of September, she obtained the referral number. After doing so, she telephoned CG and scheduled an appointment with Dr. Lesser for her husband for September 29. She testified that if she had been offered an earlier appointment she would have taken it but

---

[1] Guida also sued her husband's health maintenance organization and his insurance company. Citing OCGA § 51-1-48, Guida pleaded a right to recover for the lack of diligence in claim administration.

[2] Guida sued Dr. Adler and obtained a confidential settlement. Michael Guida's medical history included a prior history of cigarette use, high cholesterol, and complaints of chest pain. Mark B. Shoag, M.D. testified, "An EKG conducted on August 20, 1999 demonstrates abnormality."

was not told that she had other options such as paying for the visit herself. Guida conceded that she did not ask if her husband could be seen sooner if they paid for the services themselves.

On Sunday afternoon, September 26, Michael Guida told his wife that "he was going to go and piddle about in the yard for a while, and we would go eat at six o'clock." When Cynthia Guida noticed that it was starting to get dark and her husband had not yet returned, she went outside and found him lying on the side of the driveway, already cold to the touch. Guida testified that the paramedics told her "they were pretty sure it was cardiac arrest." Her neighbor, a nurse who attempted CPR, told her "she was certain it was [cardiac arrest]." No autopsy was ever performed.

The defendants moved for summary judgment on several grounds. They asserted that "none of the defendants named in this action ever met, spoke with or treated Cynthia or Michael Guida, and as such, no physician patient relationship existed between the parties" and no other relationship existed either. Arguing "there is no duty or requirement on doctors to see all patients referred to them," they claimed that no act or omission on the part of the defendants proximately caused any injury to Michael or Cynthia Guida.

Dr. Lesser and two of CG's employees testified in support of summary judgment. Dr. Lesser testified that an exercise stress test "would be about 75 percent sensitive in picking up significant ischemic heart disease, which means that about one in four patients might be missed." Dr. Lesser explained that ordinarily, when patients have positive stress tests, further testing would be prescribed, such as a nuclear stress test or a coronary arteriogram. He testified that sometimes even after a positive stress test, patients will forgo additional testing and opt for a medical management program like aspirin, beta blockers, or long-acting nitrates and then return in about two weeks. He also testified that on occasion, patients who test positive on the exercise stress test will elect to delay further testing, waiting a week or longer for additional testing.

Dr. Lesser also testified that if a procedure, such as a stress test, is an emergency, then "[u]sually the referring physician would pick up the phone and call me and tell me that there is an emergency" and such testing would be done the same day. Dr. Lesser explained that most of CG's patients come by referral and testified that "it's the responsibility of the referring physician [to tell us if it is an emergency]." Dr. Lesser testified that a complaint of chest pain is not necessarily "obvious distress" which instead means shortness of breath, low blood pressure with rapid heart action, "near blacking out or a specific type of chest pain that's excruciating or is typical of unstable angina."

Dr. Lesser testified that "[o]ur office has never refused to take

care of a patient on the basis of finances" and agreed that it would be contrary to office policy if someone had told Mrs. Guida that she had to have a referral number in order for her husband to be seen. Dr. Lesser added, "we see lots of patients who have no health insurance" or who are indigent and "we would never use the absence of a referral to refuse care."

Warnock, CG's officer manager in September 1999, testified that patients have a choice of paying for services themselves, filing with their own insurance company, or having CG do so. Warnock explained, "We will see them without the referral, but if they choose for us to file insurance then it is necessary that they contact their primary care physician regarding a referral." She also testified that CG sees patients who have no insurance.

Zacharias, the administrator of CG, disputed Cynthia Guida's testimony. Zacharias testified that he did not believe that Warnock or anyone else on the staff at CG would tell a person that they had to have a referral number before they could be seen. In his opinion, "it just wouldn't happen." Zacharias emphasized that requiring a referral number before serving patients would be contrary to the "expectations from the doctors" and contrary to the practice's standard of treating everyone "with the utmost of care and concern."

At the hearing, CG argued that even assuming that an employee had provided incorrect information to Cynthia Guida, the Guidas could have gone back to Dr. Adler or proceeded to an emergency room. CG claimed, "there's no duty on the part of a free-standing medical clinic to deal with people that aren't their patients in any particular way." On the issue of causation, the defense contended that "they can't prove that having the patient seen any sooner would have changed the outcome in the case."

Finding the absence of a physician-patient relationship and no evidence of the existence of a public or private duty or an alleged breach of such duty, the trial court granted the defendants' motion for summary judgment. The court also found that "Plaintiff failed to produce any evidence on causation to rebut Dr. Lesser's testimony."

In four somewhat overlapping claims enumerated as error, Guida contests the grant of summary judgment. Guida asserts that a jury needs to resolve the issue of causation as well as the questions of simple negligence, negligent misrepresentation, and breach of private duty. Guida claims that CG owed a legal duty not to subject others to an unreasonable risk of harm. Alternatively, Guida contends that even if CG did not inherently owe a duty, then CG assumed a duty through a gratuitous undertaking, and having voluntarily assumed a duty to Michael Guida, CG is liable for breaching that duty. Guida argues that even absent any legally cognizable duty, the defendants are liable as a result of their failure to act appropri-

ately. Guida claims that by misinforming Cynthia Guida that "insurance pre-authorization was absolutely necessary," CG made the situation worse by increasing the danger of Michael Guida suffering a heart attack during the period created by the "referral authorization" delay. Guida claims that the misinformation deprived her husband of the possibility of help from other sources.

Pretermitting consideration of whether the defendants owed any cognizable legal duty to the Guidas under any viable theory, we find the grant of summary judgment was otherwise proper. See *Meinken v. Piedmont Hosp.*, 216 Ga. App. 252, 253 (454 SE2d 147) (1995) ("If a defendant owes no legal duty to the plaintiff, there is no cause of action in negligence."). To establish a negligence claim, a plaintiff must come forward with specific facts establishing a breach of duty, as well as the other elements of negligence, and may not rest upon generalized allegations. See *Bradley Center v. Wessner*, 250 Ga. 199, 200 (296 SE2d 693) (1982). In so doing, a plaintiff must come forward with specific acts establishing negligence as to each defendant. *Tuggle v. Helms*, 231 Ga. App. 899, 902 (2) (499 SE2d 365) (1998).

Here, all of Guida's legal theories rely upon the premise that Dr. Lesser and the other defendants owed a legal duty to Michael Guida, breached that duty, and thereby caused Michael Guida's death. This lawsuit rests on the assumption Michael Guida would have been able to obtain an earlier appointment with Dr. Lesser had an employee of CG not misinformed Cynthia Guida about the necessity of having a referral number. But, the record contains no evidence that at the time that Cynthia Guida first telephoned CG on Friday, September 17, Dr. Lesser had any appointment slot available before September 29. According to Cynthia Guida's testimony she was told during that conversation that they "might be" able to work him in or that they "might have a cancellation in the next week," but there is no evidence from any source that an earlier appointment was in fact available and would have been given to her had she had the referral number at that time. In other words, neither Cynthia Guida nor anyone else testified that but for the delay attributable to procuring a referral number, Dr. Lesser would definitely have been able to have seen Michael Guida earlier than September 29.

In addition, the record lacks evidence to show that the delay in obtaining the appointment was the cause in fact or the proximate cause of Michael Guida's death. In other words, this litigation assumes that the delay in obtaining an appointment with Dr. Lesser caused Michael Guida's death. But, whether the treadmill stress test would have revealed Michael Guida's heart disease remains a question that probably can never be definitively resolved since there was no autopsy. Notwithstanding the claim to the contrary, the expert affidavit of Mark B. Shoag, M.D. did not serve to establish the requi-

site proximate causation between the purported acts and omissions of the defendants and Michael Guida's demise. Dr. Shoag testified, "It is my opinion, to a reasonable degree of medical certainty, that an exercise treadmill stress test would have demonstrated that Michael J. Guida was suffering from coronary artery disease." But Dr. Lesser testified without contradiction that in about 25 percent of patients, that particular test fails to demonstrate just that even in patients with "known coronary arteriosclerosis of significance." Dr. Lesser also testified that when a patient tests positive on the stress test, such patient would then undergo further testing. Whether Michael Guida would have agreed to additional testing or have chosen to postpone it beyond September 26 remains speculative at best.

Proximate cause means "that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." (Citation and punctuation omitted.) *T. J. Morris Co. v. Dykes*, 197 Ga. App. 392, 395-396 (4) (398 SE2d 403) (1990). But the delay in conducting the stress test did not cause Michael Guida's underlying heart disease which was what obviously put him at risk for suffering a fatal heart attack and which was apparently what ultimately caused his death. Dr. Shoag's testimony does not alter that conclusion and preclude summary judgment. Dr. Shoag also testified, "It is my opinion, to a reasonable degree of medical certainty, that Michael J. Guida would not have suffered a massive myocardial infarction and died on September 26, 1999 *if an evaluation by a cardiologist, including an exercise treadmill stress test had been performed between September 16 and September 26, 1999.*" (Emphasis supplied.) Guida, however, offered no evidence that Dr. Lesser could have completed such an evaluation by September 26. It is undisputed that Michael Guida's primary care physician did not contact Dr. Lesser or anyone else at CG to seek an expedited stress test. It is likewise undisputed that Cynthia Guida did not even try to make an appointment until Friday, September 17 and that she had a referral number as early as the following Monday (September 20) and no later than September 22 (Wednesday). Again, we have found no evidence, and Guida has not directed our attention to any, that shows that Dr. Lesser was available to see Michael Guida at any time prior to the scheduled appointment time on September 29. Therefore, the record contains no evidence that an evaluation by this cardiologist including the exercise treadmill stress test could have been done by Sunday, September 26, even assuming arguendo that such an evaluation would have revealed the extent of the decedent's heart disease. Accordingly, we find that the defendants were entitled to summary judgment as a matter of law. See *Anthony v. Chambless*, 231 Ga. App. 657, 661 (1) (500 SE2d 402) (1998) (lack of evidence of proximate causation, an

essential element of negligence claim, entitled defendant to summary judgment).

Moreover, although this lawsuit was brought based on claims of simple negligence and negligent misrepresentation and not medical malpractice, we find that summary judgment was also warranted on the basis that the facts here did not establish a doctor-patient relationship which would give rise to a duty on the part of Dr. Lesser and his employees. Other than the referral and the telephone conversation with Cynthia Guida to set up the appointment, there is no evidence that Dr. Lesser or any of his employees had any contact with Michael Guida or that Dr. Lesser had any information about Michael Guida's medical condition or had rendered any opinion or given any advice about his care and treatment. Michael Guida himself never contacted Dr. Lesser or any of his employees and never had any conversation with anyone about either his symptoms or his need for an appointment and evaluation. The touchstone for negligence cases of this nature, however they are couched, must be the actual existence of a doctor-patient relationship, not some inchoate or nebulous responsibility. See *Minster v. Pohl*, 206 Ga. App. 617, 619 (1) (426 SE2d 204) (1992) (doctor-patient relationship must be consensual). We decline thus to take this opportunity to find that a physician could be held liable to a potential patient with whom he has never spoken, seen, met, or been consulted about. See *Schrader v. Kohout*, 239 Ga. App. 134, 138 (522 SE2d 19) (1999) (physician entitled to summary judgment in medical malpractice case where nothing in the record shows physician ever acted as plaintiff's doctor); see also *Anderson v. Houser*, 240 Ga. App. 613, 619 (1) (523 SE2d 342) (1999) (fact that doctor has agreed to be on-call to be consulted about a patient's condition does not give rise to doctor-patient relationship).

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED OCTOBER 22, 2003 —
RECONSIDERATION DENIED NOVEMBER 24, 2003 —

*Neal H. Howard & Associates, Neal H. Howard, William D. James*, for appellants.

*Allen & Weathington, Paul E. Weathington, John D. Hocutt*, for appellees.