**SECOND DIVISION
BARNES, P. J.,
MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/**

**July 15, 2013**

# In the Court of Appeals of Georgia

A13A0646. GEORGIA CLINIC, P.C. et al. v. STOUT et al.

RAY, Judge.

After receiving an injection in her arthritic knee at the Georgia Clinic, P.C., Cho Kim developed a painful and difficult to treat knee infection; a few months later, she committed suicide. Claiming that the injection to Kim's knee caused the infection and her suicide, Chum Sook Park, as next of kin, and Herman Edward Stout, as the administrator of Kim's estate (collectively, "plaintiffs"), filed the instant medical malpractice suit seeking compensatory and punitive damages against the following defendants: Georgia Clinic, P.C.; Yong Kwon, P.A.; William Eyzaguirre, M.D.; and Naresh Parikh, M.D. (collectively, "defendants"). After trial, the jury found in favor of the plaintiffs and awarded compensatory and punitive damages against the

defendants. The defendants appeal from the denial of their motion for a new trial, or in the alternative, for j.n.o.v.[1]

The defendants argue that the trial court erred in denying their motions for the following reasons: (1) the evidence presented at trial was insufficient to support an award of compensatory and punitive damages; (2) the evidence presented at trial was insufficient to show that a failure to supervise was a proximate cause of the plaintiffs' damages; (3) the trial court erred in rendering a judgment on a void verdict; (4) the punitive damages were excessive; (5) the plaintiffs' expert testimony was speculative; and (6) the trial court's jury instructions were in error. Finding no reversible error, we affirm.

When a jury returns a verdict that the trial court enters as a judgment, that judgment "must be affirmed on appeal if there is any evidence to support the verdict, because the jurors are the exclusive judges of the weight and credibility of the

---

[1] The defendants also note in their notice of appeal that they are appealing from the trial court's denial of their motion for partial summary judgment and renewed motion for partial summary judgment. However, the trial court's ruling on these motions is not addressed in their brief. Further, "when, as here, a motion for summary judgment is overruled on an issue and the evidence at trial authorizes the verdict . . . on that issue, any error in overruling the motion for summary judgment is harmless." (Citations and punctuation omitted.) *Vaughan v. ACCC Ins. Co.*, 314 Ga. App. 741, 742 (1) (725 SE2d 855) (2012).

2

evidence. We must construe the evidence with every inference and presumption in favor of upholding the verdict." (Citation omitted.) *Sagon v. Peachtree Cardiovascular and Thoracic Surgeons, P.A.*, 297 Ga. App. 379 (677 SE2d 351) (2009).

So viewed, the evidence presented at trial shows that on January 15, 2009, Kim, who was 86 years old, went to the Georgia Clinic in Doraville seeking treatment for her arthritic knee. Kim was examined by Kwon, a physician's assistant, who injected her left knee with medication drawn from a multi-dose vial. Because the injection was not administered properly under sterile conditions, Kim's knee was infected with methicillin-sensitive staphylococcus aureus ("MSSA"). Four other patients of the clinic were also infected with MSSA from the same multi-dose vial over a five-day period.

At the time of the injection, Kwon was supervised by Dr. Eyzaguirre, a physician who worked part-time at the clinic, and Dr. Parikh, the owner of eleven Georgia Clinic locations. Kwon had examined Kim at the Georgia Clinic several times in the past and had noted symptoms of depression and anxiety, but he never prescribed her medicine or referred her to seek treatment for these symptoms.

After receiving the injection, Kim returned to the clinic on three occasions, complaining of fevers, chills and redness in her knee and she received antibiotics. After her third visit, Dr. Eyzaguirre instructed Kwon to send Kim to the hospital, where after it was determined that she had a septic knee caused by MSSA, she underwent a surgical procedure. After returning home, Kim continued taking antibiotics until they were discontinued during a follow-up appointment with her doctor on February 27, 2009.

On March 9, 2009, Kim committed suicide by jumping from the window of her 14th floor apartment. She left behind a suicide note stating, in Korean, "pain in leg . . . I can't take it no more . . . better to die . . . I'm sorry."

During her stay at the hospital, one of Kim's treating physicians became alarmed that Kim's infection might be part of an outbreak and contacted Dr. Kathryn Arnold, an epidemiologist at the Centers for Disease Control and Prevention, to conduct a further investigation of the Georgia Clinic. Dr. Arnold, along with representatives from Dekalb County and the Georgia Division of Public Health, conducted an investigation of the Georgia Clinic. The report created by these entities noted that their investigation of the Georgia Clinic revealed "abundant evidence of poor infection control practices . . . and inadequate environmental cleaning and

4

disinfection practices" including "1) re-use of multi-dose medication in an uncontrolled environment; 2) inadequate hand hygiene. . . and 3) inappropriate cleaning and disinfection agents contributing to inadequate care of medical equipment." The report concluded that the infection control lapses at the clinic constituted "a serious threat to public health."

Dr. Richard Berg testified at trial for the plaintiffs as an expert on infectious diseases. He testified that the five-person outbreak of MSSA "is one of those things that should almost never happen, if ever happen." He opined that the primary lapses indicating poor infection control practices at the Georgia Clinic were namely "poor hand-washing . . . no sterile field . . . the use of multi-dose vials . . . [and] a pattern of misunderstanding the most rudimentary issues in infection control."

The plaintiffs filed the present complaint against the defendants, alleging negligence and professional negligence against all defendants, and vicarious liability and respondeat superior against Georgia Clinic, Dr. Eyzaguirre, and Dr. Parikh. The complaint sought both compensatory and punitive damages. At trial, the defendants stipulated that their "negligence and breaches in the standard of care in giving Ms. Kim a knee injection on January 15, 2009[,] directly and proximately caused Ms. Kim

to suffer a knee infection." The defendants further stipulated that Kim's estate was "entitled to recover damages for hospital and medical bills, and for conscious pain and suffering relating to the knee infection," and acknowledged that Kim incurred $60,684.37 in medical expenses relating to the knee infection. The defendants did not, however, stipulate that Kim's knee infection contributed to her suicide.

At the close of the plaintiffs' case, the defendants moved for a directed verdict, which was denied. Later, the jury returned a verdict in favor of the estate in the following amounts: $400,000 in compensatory damages to Park, the next of kin, for the "infection" claim; and $500,000 in compensatory damages to the plaintiffs for the "wrongful death" claim. In a bifurcated proceeding, the jury awarded the following punitive damages awards to the plaintiffs: $750,000 against Georgia Clinic; $750,000 against Kwon; $1,000,000 against Dr. Parikh; and $0 against Dr. Eyzaguirre. The trial court entered judgment jointly and severally against all defendants as to the compensatory damages, and capped the punitive damages award at $250,000 because the jury found that the defendants did not act with the specific intent to cause harm.[2]

---

[2] The trial court apportioned the punitive damages award as follows: $75,000 against Georgia Clinic; $75,000 against Kwon; and $100,000 against Parikh.

6

See OCGA § 51-12-5.1 (f) - (g). The defendants appeal from the trial court's denial of their motions for a directed verdict and for a new trial or j.n.o.v.

1. In two enumerations of error, the defendants allege that the evidence presented at trial did not demonstrate by clear and convincing evidence that the defendants exhibited an entire want of care and an indifference to consequences sufficient to warrant an award of punitive damages. Specifically, the defendants argue that punitive damages were not warranted because Kim's MSSA infection was caused by a single incident of negligence or "human error," and that the evidence did not show that the corporation failed to implement and supervise protocols and policies for hygienic practices. We disagree.

An award of punitive damages may be authorized when it is proven by clear and convincing evidence that the "circumstances of the tort show an entire want of care and an indifference to consequences. Wilful and intentional misconduct is not essential." (Citation omitted.) *Hoffman v. Wells*, 260 Ga. 588 (1) (397 SE2d 696) (1990). See also OCGA § 51-12-5.1 (b). However, "negligence, even gross negligence, is not sufficient to support an award of punitive damages." (Citation omitted.) *Comcast Corp. v. Warren*, 286 Ga. App. 835, 839 (2) (650 SE2d 307) (2007). Because punitive damages require a finding of some form of culpable conduct

7

under OCGA § 51-12-5.1 (b), "conscious indifference to consequences" requires a finding that a defendant had "an intentional disregard of the rights of another, knowingly or wilfully." (Citation omitted.) Id.

When reviewing a trial court's denial of a motion for directed verdict or the denial of a motion for new trial concerning punitive damages, this Court "must determine as a matter of law whether the evidence was sufficient under the clear and convincing standard." (Citation omitted.) Id. The clear and convincing standard "is an intermediate standard of proof, requiring a higher minimum level of proof than the preponderance of the evidence standard, but less than that required for proof beyond a reasonable doubt." (Citation and punctuation omitted.) Id. at 839-840 (2).

In the present case, all of the defendants, including the corporation, stipulated as to liability and that their "negligence and breaches in the standard of care" were the proximate cause of Kim's knee infection. The evidence further showed that Kim's infection was not an isolated incident, because four other patients were infected with MSSA from the same multi-dose vial of medication. Dr. Berg, an expert in infectious diseases, opined that the multi-dose vial was contaminated because the clinic did not maintain sterile conditions or follow proper protocols when administering and storing the drug. He further testified that the MSSA outbreak was "one of those things that

8

should almost never, if ever[,] happen." He explained that the Georgia Clinic and its employees exhibited a pattern of "poor infection control practices," such as a failure to maintain sterile field and poor hand-washing because the clinic did not have sinks in the examination rooms and did not provide alcohol hand cleaners. [3]

The above evidence demonstrating that the clinic had a pattern of maintaining poor sanitary conditions and that it failed to improve such conditions when presented with suggestions on how to do so is sufficient for the jury to have found, under the clear and convincing standard, that defendants' negligence exhibited an entire want of care and a conscious indifference to consequences. See *Hoffman*, supra at 588-589 (1) (trial court did not err in denying motion for directed verdict as to punitive damages when the evidence showed that defendant surgeon's actions in operating on patient's wrong hand when he could have determined from the medical records which

_____

[3]Dr. Arnold, the epidemiologist, deposed that the clinic's infection control practices were "rudimentary, inadequate, [and] substandard" and that she was "dismayed by some of the infection-control practices" that she observed during her investigation of the clinic. She opined that the multi-dose vial was likely contaminated with MSSA as a result of "human errors" in handling the needle because the staff "demonstrated many deficiencies in their knowledge and practices with regard to infection control and prevention." Dr. Arnold further deposed that although she had provided suggestions to the clinic on how to improve sanitary conditions, she "did not see an intention or a tendency toward a comprehensive fix for [the clinic's] infection-control issues" during her three visits to the clinic.

9

hand actually needed the operation, showed lack of care sufficient to amount to conscious indifference of consequences justifying an award of punitive damages); *Hodges v. Effingham County Hosp. Auth.*, 182 Ga. App. 173, 175 (2) (355 SE2d 104) (1987) (nurse's failure to convey information regarding a patient's heart condition and medication to treating doctor demonstrated a want of care and a conscious indifference to consequences sufficient to reverse the trial court's grant of defendant's motion for a directed verdict as to punitive damages).

2. The defendants contend that the trial court erred in denying their motion for a new trial or for j.n.o.v. because there was insufficient evidence presented at trial to prove that the negligent supervision of Kwon by Dr. Parikh and Dr. Eyzaguirre was the proximate cause of Kim's damages, or to prove that the Georgia Clinic was liable under a theory of respondeat superior for failure to require appropriate hygienic protocols.

The plaintiffs' complaint set forth claims against the Georgia Clinic, Dr. Parikh and Dr. Eyzaguirre for negligence, professional negligence, and respondeat superior/vicarious liability, and asserted additional claims of negligent supervision against Dr. Parikh and Dr. Eyzaguirre. The plaintiffs' complaint and the consolidated pre-trial order sought wrongful death damages under the theory that Kim's knee

10

infection, combined with her untreated depression, were the proximate causes of her suicide. The jury's verdict form in this case did not specify whether the jury found the defendants liable for the wrongful death claim because of their negligence in causing Kim's knee infection, or because of a failure to diagnose and treat her depression. Rather, the jury's verdict found *all* of the defendants liable for $500,000 in compensatory damages for "wrongful death."

"In the absence of a verdict form requiring more specificity, the method by which a jury reaches a particular verdict is not a matter of which this [C]ourt can take judicial cognizance." (Citation and punctuation omitted.) *Brock v. Douglas Kohoutek, L. P.*, 225 Ga. App. 104, 108-109 (3) (483 SE2d 342) (1997). Accord *Bloodworth v. Bloodworth*, 277 Ga. App. 387, 389 (1) (b) (626 SE2d 589) (2006). If the defendants desired an explanation for the basis of the wrongful death award, they should have objected to the jury's verdict form.

Moreover, "where there is some evidence to support the verdict, the grant or denial of a new trial on evidentiary grounds is within the trial court's discretion." (Citations omitted.) *Brock*, supra at 109 (3). See OCGA § 51-12-12 (a). "Unless there is no evidence to support the verdict, we will not find that discretion abused." (Citation omitted.) Id. Here, the defendants collectively stipulated that their

11

"negligence and breaches in the standard of care" in injecting Kim's knee "directly and proximately caused [Kim] to suffer a knee infection." There was evidence presented at trial that Kim's suicide was a result of the pain, suffering and reduced mobility she experienced as a result of her knee infection. Dr. Frierson, the plaintiff's expert on psychiatry and depression, stated that it was his opinion "to a reasonable degree of medical probability" that Kim's depression was worsened by the pain and lack of mobility caused by her knee infection, and that this led to Kim's suicide.

Because there was some evidence to support the jury's finding of liability as to the plaintiffs' wrongful death claim based upon the defendants' stipulated negligence, we need not address whether or not there was sufficient evidence to support a finding of respondeat superior or negligent supervision.

3. The jury awarded punitive damages against all defendants, except Dr. Eyzaguirre. The defendants contend that the failure to award punitive damages against one defendant invalidates the award of punitive damages against the remaining defendants. In support of this contention, defendants cite to *Chupp v. Henderson*, 134 Ga. App. 808 (216 SE2d 366) (1975), for the proposition that when multiple defendants are sued as joint tortfeasors, punitive damages cannot be awarded unless the jury finds all of the defendants liable for punitive damages. Id. at 812 (3).

12

However, "[t]he authority relied upon [by the defendants] is mere dicta" and is not binding upon this Court. (Citation omitted.) *Go Medical Indus. PTY, Ltd. v. Inmed Corp.*, 2005 WL 6776865 (3) (N. D. Ga. 2005) (finding this statement of law from *Chupp*, supra. to be "mere dicta" and declining to apply it). Accord *Sightler v. Transus, Inc.*, 208 Ga. App. 173, 174 (430 SE2d 81) (1993) (finding the same statement of law set forth in *Willis v. Hill*, 116 Ga. App. 848, 868 (5) (159 SE2d 145) (1967), rev'd by *Hill v. Willis*, 224 Ga. 263 (161 SE2d 281) (1968), and relied upon by *Chupp,* to be dicta); *Crow v. Evans*, 183 Ga. App. 581, 582 (1) (359 SE2d 446) (1987) (rejecting this statement of law in *Chupp* as "mere dicta"). Nor could we identify any other case setting forth this rule of law. Accordingly, the trial court did not err in denying the defendants' motion for a new trial on this ground.

4. In their fifth enumeration of error, defendants contend that the jury's award of punitive damages was excessive because the jury was prejudiced by the introduction of irrelevant and inflammatory evidence. We review this claim under an abuse of discretion standard. *Time Warner Entertainment Co. v. Six Flags Over Ga.*, 254 Ga. App. 598, 599-600 (2) (a) (i) (563 SE2d 178) (2002).

In Georgia, the purpose of punitive damages is to deter the repetition of reprehensible conduct by the defendant. OCGA § 51-12-5.1 (c). "Because deterrence

13

is based on factors other than the actual harm caused, the Supreme Court of Georgia rejected the notion that punitive damages must necessarily bear some relationship to the *actual* damages awarded by the jury." (Footnote and punctuation omitted; emphasis in original.) *Bickerstaff Automotive, Inc. v. Tsepas*, 258 Ga. App. 327, 330 (5) (574 SE2d 322) (2002) (physical precedent only). An award of punitive damages will not be disturbed on appeal unless it is "so excessive or inadequate as to shock the judicial conscience." (Citation and punctuation omitted.) *Clarke v. Cotton*, 207 Ga. App. 883, 883-884 (1) (429 SE2d 291) (1993). Although we do not mechanically look to the ratio between general and punitive damages to resolve the question of excessiveness, that ratio is some evidence of whether the jury's award was infected by undue prejudice or bias. *Southeastern Security Ins. Co. v. Hotle*, 222 Ga. App. 161, 164 (1) (e) (473 SE2d 256) (1996).

In the present case, the trial court reduced the jury's award of punitive damages from a combined $2.5 million to $250,000 because the jury found that none of the defendants exhibited an intent to harm Kim. See OCGA § 51-12-5.1. The $2.5 million punitive damage award rendered by the jury was approximately 2.5 times the $900,000 awarded in compensatory damages. The trial court did not abuse its discretion in denying the motion for new trial or j.n.o.v. on this ground because there

14

is no evidence that the award of punitive damages was "infected by undue passion and prejudice." *Bickerstaff Automotive, Inc.*, supra. See *Southeastern Security Ins. Co.*, supra at 161, 164 (1) (e) (jury's award of punitive damages was not excessively disproportionate when jury awarded $1 in general damages and $45,000 in punitive damages against defendant).

5. Defendants argue that the trial court erred in denying their motions for directed verdict and for new trial as to the jury's award of compensatory damages for the wrongful death claim because the testimony of the plaintiffs' expert on psychiatry and depression, Dr. Frierson, was speculative as to the proximate cause of Kim's death.[4]

"An expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility.

---

[4] We decline to address defendants' additional argument, set forth within the same enumeration, that Dr. Frierson was "incompetent to testify as to the standard of care" under OCGA § 24-9-67.1. This argument was not separately enumerated, as required by this Court's Rule 25. We remind the defendants that "[p]arties are not permitted to enlarge their enumeration of errors by including additional issues in their brief." (Citations omitted.) *K-Mart Corp. v. Hackett*, 237 Ga. App. 127, 130 (1) (514 SE2d 884) (1999). Further, the defendants did not seek to disqualify or limit Dr. Frierson's testimony through an OCGA § 24-9-67.1 motion before trial. See *Airasian v. Shaak*, 289 Ga. App. 540, 543 (2) (657 SE2d 600) (2008) ("Both the Supreme Court of Georgia and this Court have ruled that a challenge under OCGA § 24-9-67.1 must be completed by the pretrial conference") (footnote omitted).

15

It must be based on reasonable medical probability or reasonable medical certainty." *Zwiren v. Thompson*, 276 Ga. 498, 503-504 (578 SE2d 862) (2003). "In presenting an opinion on causation, the expert is required to express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate." (Citation and punctuation omitted.) Id at 501. Dr. Frierson's expert testimony in the present case satisfied this burden.

Dr. Frierson testified that he relied upon his review of Kim's medical records, the relevant deposition testimony, and his many years of experience in psychiatry, to conclude that it was a breach in the standard of care for Kwon, during his several visits with Kim at the Georgia Clinic, to notice that Kim was exhibiting signs of depression and to fail to offer Kim treatment or to refer her to another doctor for treatment for depression. Dr. Frierson explained that the potential consequences of failing to treat depression are increased suffering, health complications, and suicide, and that chronic pain and lack of mobility can worsen depression symptoms. He opined that the combination of Kim's untreated depression, the severe pain caused by the infection in her knee, and her decreased mobility and independence "amounted to a perfect storm in contributing to" Kim's suicide. He further stated that it was his opinion "to a reasonable degree of medical probability" that Kim's knee infection,

16

coupled with her untreated depression, which were the proximate cause of her suicide. Dr. Frierson explained that he based these opinions on his prior experience in psychiatry, on a study conducted by the American Association of Suicidology, and other relevant studies.

The trial court did not err in denying the defendants' motion for new trial or for j.n.o.v. on this issue.

6. The defendants contend that the trial court failed to give a proper jury charge on the issue of whether suicide was a reasonably foreseeable consequence of their conduct. Specifically, the defendants object to the following jury charge given by the trial judge:

> If the *possibility* of suicide is a reasonably foreseeable consequence of Defendant's negligent conduct, legal causal connection between that conduct and injury is not broken.

(Emphasis supplied.) Defendants argue that adding the word "possibility" instead of the word "probability" in the above charge confused the jury as to proximate cause. However, at the conclusion of the jury charges when called upon by the trial court for their exceptions, the defendants raised no objections to that charge. Because the record discloses no objection at trial on this ground and because the complained-of

17

charge does not amount to a substantial error as a matter of law, defendants have waived any right to assert error in the trial court's charge. See OCGA § 5-5-24 (a), (c); *Heston v. Lilly*, 248 Ga. App. 856, 858 (2) (546 SE2d 816) (2001).

Even if the alleged error had not been waived, on appellate review, jury charges "must be read and considered as a whole in determining whether the charge contained error. Challenged segments cannot be considered in isolation to ascertain whether the charge is accurate and fair and worked no prejudice to the complaining party." (Citations and punctuation omitted.) *Sagon*, supra at 381. Here, the trial court gave thorough instructions as to proximate cause, including an explanation that a defendant "may be held liable for an injury when that person commits a negligent act that puts other forces in motion . . . resulting in the injury, when such other forces are the natural, *probable* result of the act that [d]efendant committed" and that there could be no recovery unless the injuries could "reasonably have been foreseen as the natural, reasonable and *probable* result of the original negligent act." We find no plain legal error.

7. In their final enumeration of error, the defendants challenge the trial court's jury instruction providing that the administrator of Kim's estate is "entitled to recover . . . damages for the constant pain and suffering endured by [Kim] prior to her death.

18

This includes physical and mental anguish and terror suffered by [Kim] during the final moments of her life." Defendants argue that because Kim left a suicide note, she had "planned her death and was comfortable in her decision [to commit suicide]." Thus, the defendants argue that "[a]ny inference that she suffered physical and mental anguish and terror in the 'final moments' was not supported by any evidence."

"If there is even slight evidence on a specific issue, it is not error for the court to charge the jury on the law related to that issue. The measure of damages for pain and suffering is within the enlightened conscience of the jurors." (Citations and punctuation omitted.) *Daniel v. Smith*, 266 Ga. App. 637, 643-644 (7) (597 SE2d 432) (2004). The defendants' contention that Kim's suicide note indicates that she was "comfortable" in her decision to commit suicide is, quite frankly, offensive, in addition to being utterly without merit. The suicide note left by Kim is sufficient to prove that she suffered from pain during her final moments, because it expressly stated that she was experiencing "too much pain in leg" and that she "can't take it no more." We find no error.

*Judgment affirmed. Barnes, P. J., and Miller, J., concur.*