**THIRD DIVISION
MCFADDEN, C. J.,
DOYLE, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

***DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.***

**September 28, 2020**

# In the Court of Appeals of Georgia

A20A1233. ARNOLD v. TURBOW et al.                DO-044

DOYLE, Presiding Judge.

Catherine Arnold, as the administrator of the estate of Michael Smith, brought this wrongful death action against Dr. Sarah Turbow; Dr. Terry Jacobson; Grady Hospital; and Emory University School of Medicine.[1] Arnold asserts claims stemming from the defendants' care and discharge decisions in March 2015, placing Smith in a personal care home — "The Providers" — allegedly unequipped to provide adequate care to Smith, who was severely autistic and died at the home after choking on another resident's food in November 2015. Following the grant of summary judgment to Turbow, Jacobson, Grady Hospital, and Emory University, Arnold

---

[1] Arnold later added as defendants a psychiatric nurse and psychiatrist, but those defendants have settled and are not parties to this appeal.

appeals, contending that the trial court erred by concluding that she has failed to demonstrate a triable issue as to proximate cause. Based on the particular facts of this case, we disagree and affirm.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.[2]

Much of the factual background of this case was recounted in a related appeal brought by Arnold with respect to her suit against The Providers personal care home and its alleged owners[3]:

> [T]he record shows that Smith was diagnosed with severe autism, and although he was in his mid-thirties, he did not speak and had the mental age of a three-year-old child. He lived with his mother (Arnold's sister), but after the mother exhibited troubling behavior, Arnold contacted adult protective services and, on their advice, contacted police who assisted Arnold in getting Smith and his mother to Grady Hospital for

---

[2] (Citation omitted.) *Matjoulis v. IntegoGen . Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

[3] See *Arnold v. Word*, __Ga. App. __ (846 SE2d 143) (2020) (affirming the grant of summary judgment to one of the defendants in the personal care home case).

2

medical and psychological evaluations. [After several days of medical treatment, Smith was ready for discharge, and] Grady Hospital contacted Dorothy [Word], the founder and CEO of The Providers, to inquire about placing Smith at The Providers[. . . . A]fter Arnold visited the facility, Smith was placed there as a resident [in March 2015]. The day before Smith arrived at The Providers, Arnold told [Word] that Smith needed his food cut up "because he only swallowed."

Within the first week, [Word] realized that The Providers was not an appropriate placement for Smith because he lacked the ability to perform basic functions such as go to the bathroom by himself. [Word] informed Arnold and began the process of engaging social services to relocate Smith, but the process played out for months. During this time, [Word] believed that Smith had been mistreated prior to coming to her, and she and her staff continued to work with Smith to help him progress. When Smith arrived at The Providers, he would not eat unless the door was closed and the lights were off; after two months, he was eating with other residents. One morning [in November 2015], after finishing his own breakfast, Smith returned to the dining area and "snatch[ed]" a sausage off of another resident's plate and "stuff[ed]" it in his mouth. In the process of eating it, Smith choked; [Word] quickly realized he was choking and attempted to perform an abdominal thrust to rescue Smith, but she was unsuccessful. Smith asphyxiated on the food and died.

With respect to the allegations in this case regarding Smith's care at the hospital, the record in this appeal shows that when Smith first presented at the

3

emergency department of Grady Hospital, he was highly agitated, and his medical team used various medications to calm him down so that he could be evaluated. Smith was diagnosed with rhabdomyolysis (a breakdown of muscle tissue) and an infection and admitted to the hospital for treatment, receiving care from Jacobson (the attending physician) and Turbow (a third-year resident and licensed physician specializing in internal medicine). Turbow and Jacobson were Emory employees working at Grady.

After Smith adjusted to the hospital surroundings, he was able to function in the hospital without medication, and he fed himself cut-up food without assistance. After approximately ten days of medical treatment, Smith was ready for discharge, but because Smith's mother was exhibiting psychotic symptoms, Arnold requested that Grady find an appropriate placement for him, rather than send him back home.[4] Based on observations of Smith's conduct at the hospital, medical staff determined that a personal care home was appropriate, and the recommendation was made to Arnold that Smith be discharged to The Providers. Arnold was allowed to visit The Providers and had no objection.

---

[4] Smith's mother ultimately was relocated to a nursing home.

When it became time to be transported to The Providers, Smith became agitated and required medication for the journey. After transitioning to The Providers, Smith lived there from March 2015 to November 2015, when he died as a result of choking on the sausage he took from another resident's plate at breakfast.

Based on these events, Arnold sued the medical care providers in the present action. Following discovery, Turbow, Jacobson, Grady Hospital, and Emory University moved for summary judgment on the following grounds: (1) the record revealed no evidence of a breach of the standard of care, (2) the defendants' conduct was not the proximate cause of Smith's death, and (3) the plaintiff's expert, a psychiatrist, was not competent to testify as to the applicable standard of care of the internal medicine defendants. After a hearing, the trial court granted the summary judgment motion on the ground that the plaintiff could not demonstrate proximate cause, and it granted a motion to exclude the testimony of plaintiff's expert psychiatrist on the ground that he was not competent to testify as to the standard of care applicable to the discharge decisions made by internal medicine physicians at Grady. Arnold now appeals both rulings.

1. Arnold contends that the trial court erred by concluding that she could not demonstrate that the conduct of the medical staff at Grady was the proximate cause of Smith's choking death at The Providers nearly eight months after discharge. We disagree.

Arnold's claim focuses on the decision to discharge Smith to The Providers,[5] which she alleges was not an appropriate placement for him. Thus, she has a burden to demonstrate that the discharge decision made by the medical staff was the proximate cause of Smith's death:

> To recover in a medical malpractice case, a plaintiff must show not only a violation of the applicable medical standard of care but also that *the purported violation or deviation from the proper standard of care is the proximate cause of the injury sustained*. A mere showing of negligence without proof of causation is insufficient to withstand summary judgment. Causation is established through expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge[.] The expert must state his or her opinion regarding proximate causation in terms stronger than that of medical possibility — e.g., a reasonable degree of medical certainty or reasonable medical probability. . . . This

---

[5] Arnold's expert identified no violation of the standard of care from the standpoint of the medical (non-psychological) treatment Smith received while at Grady. Rather, he testified that the staff should have consulted a psychologist to aid in the discharge decisions.

6

means that [Arnold was] required to present expert testimony that showed to a reasonable degree of medical certainty that [the medical staff's alleged] failure to adhere to the applicable standard of care caused Mr. [Smith's death].[6]

In other words, a determination of proximate cause would require a finding that Smith's death by choking on food he stole from another resident's plate was "the natural and probable consequence of the [discharge to The Providers, which result] ought to have been foreseen by the wrongdoer[s] as *likely to flow from [their] act[s]*."[7] Ordinarily, this is for the jury, but "in plain and undisputed cases the court may make the determination as a matter of law."[8]

Here, the material facts are not in dispute. Arnold relies on the deposition testimony of her expert who opined, in summary, that if the defendants had consulted with a psychologist and discharged him to a different facility with "appropriate care and supervision, Mr. Smith would not have taken that extra food from the plate of

---

[6] (Citations and punctuation omitted; emphasis supplied.) *Swint v. Mae*, 340 Ga. App. 480, 482 (1) (798 SE2d 23) (2017).

[7] (Punctuation omitted; emphasis supplied.) *Duncan v. Klein*, 313 Ga. App. 15, 22 (3) (720 SE2d 341) (2011).

[8] (Punctuation omitted.) Id., quoting *White v. Rolley*, 225 Ga. App. 467, 470 (2) (484 SE2d 83) (1997).

another person." But in "[i]n presenting an opinion on causation, the expert is required to express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate."[9] While the expert here relied on his experience and training in psychology and stated that it is not unusual for autistic patients to endanger themselves, the accidental choking death due to Smith's stealing food in November 2015 was simply too remote both in time and in circumstance from the hospital discharge nearly eight months prior. Because of the facts of this case, Arnold's expert could not assert causation without making numerous assumptions about the care at The Providers and the result of any changes in Smith's environment, supervision, conduct, and receptiveness to therapy. Proximate cause means "that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred."[10] The passage of time demonstrates the attenuated causal effect of any negligence in the discharge. Whereas an immediate injury resulting from poor supervision could have supported an inference of causation, here we have the

---

[9] (Punctuation omitted.) *Ga. Clinic, P.C. v. Stout*, 323 Ga. App. 487, 495 (5) (747 SE2d 83) (2013).

[10] *Guida v. Lesser*, 264 Ga. App. 293, 297 (590 SE2d 140) (2003).

opposite: nearly eight months of time between the discharge and the occurrence of the injury. Merely stating that causation exists is not sufficient to survive a motion for summary judgment if the undisputed facts show that such a statement is overly speculative or conclusory.[11] As the Supreme Court of Georgia has observed,

> [t]he requirement of proximate cause constitutes a limit on legal liability; it is a policy decision that, for a variety of reasons . . . the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery. And, a general rule of proximate cause is that *a wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience.*[12]

---

[11] See *Whitley v. Piedmont Hosp., Inc.*, 284 Ga. App. 649, 656 (2) (644 SE2d 514) (2007) (holding that mere recitation that a breach of the standard of care caused the injury was overly conclusory without particulars); *Guida*, 264 Ga. App. at 297 (holding that an expert's statement of causation was not sufficient to survive summary judgment in light of the speculative nature of the expert's opinion).

[12] (Citations and punctuation omitted; emphasis supplied.) *Goldstein, Garber & Salama, LLC v. J. B.*, 300 Ga. 840, 842 (1) (797 SE2d 87) (2017). See also *Zwiren v. Thompson*, 276 Ga. 498, 503-504 (578 SE2d 862) (2003) (summarizing the applicable law in a jury charge: "An expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility.").

In light of the length of time Smith spent at The Providers after discharge, and given the unique nature of the injury at issue — choking after stealing food — the undisputed record shows that the injury simply was too causally remote from the hospital discharge decisions made by the defendants. Accordingly, Arnold cannot demonstrate causation, and the trial court properly granted summary judgment to Turbow, Jacobson, Grady Hospital, and Emory University.

2. In light of our ruling in Division 1, we need not address Arnold's second enumeration challenging the trial court's exclusion of her expert witness based on his lack of qualification under OCGA § 24-7-702.

*Judgment affirmed. McFadden, C. J., and Hodges, J., concur.*