**THIRD DIVISION**
**DOYLE**, P. J.,
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 27, 2024**

# In the Court of Appeals of Georgia

A24A0551. GEE et al. v. TYLER & COMPANY, LLC.

WATKINS, Judge.

Joan Elizabeth Gee appeals from a jury verdict in favor of her former employer, Tyler & Company, LLC, that found her liable for breaching the non-solicitation and confidentiality provisions of her employment contract. On appeal, Gee argues that the trial court erred in denying her motions for a directed verdict and judgment notwithstanding the verdict because Tyler failed to demonstrate: (1) that her solicitations caused business to move away from Tyler; and (2) that she used confidential information or that Tyler sustained damages as a result of any disclosure. For the reasons set forth below, we affirm.

> [O]n appeal from a trial court's rulings on motions for directed verdict and judgment notwithstanding the verdict, we review and resolve

the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments notwithstanding the verdict are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.[1]

So viewed, the record shows that Tyler was a healthcare executive search firm. Tyler took a fee from hospitals and other healthcare providers to perform nationwide recruitment. Gee started working for Tyler in 2012 and became a senior vice president. In this role, Tyler's president described Gee as the "face" of the company, as Gee was responsible for maintaining and developing client relationships.

In 2014, Gee executed a non-solicitation and confidentiality agreement with Tyler. First, under the non-solicitation provision, Gee agreed that, for the period of her employment and for two years after her employment, she would not "directly or indirectly" solicit a client or prospective client with whom she had contact at Tyler for the purposes of selling services similar to the services she provided at Tyler. "Client" was defined as a company to which Tyler had referred a candidate for employment or any company which Tyler had the contract to refer a candidate within

---

[1] (Citation and punctuation omitted.) *Fertility Technology Resources v. Lifetek Med.*, 282 Ga. App. 148, 149 (637 SE2d 844) (2006).

the last 12 months of Gee's employment. "Prospective Client" was defined as any company Tyler had actively solicited within the last 12 months of Gee's employment. Second, under a confidentiality provision, Gee agreed that, for the period of her employment and for two years after her employment, she would not "directly or indirectly use or disclose" any confidential information except with Tyler's written consent. She also agreed to return all written materials and records at the end of her employment.

In July 2017, DHR International, Inc. — a competitor of Tyler — sent Gee an offer of employment, which Gee eventually accepted. The employment offer contained a provision that DHR agreed to indemnify Gee if a lawsuit was brought against her regarding a non-solicitation agreement with her former employer. Gee resigned from Tyler in the beginning of September 2017.

Northeast Georgia Health Systems ("NGHS") and Maine Medical were Gee's "two biggest clients" with Tyler. Following Gee's departure from Tyler, NGHS and Maine Medical awarded contracts to DHR.

Tyler's complaint, as amended, asserted claims of breach of contract with respect to the non-solicitation, confidentiality, and non-disparagement provisions, tortious interference with contractual relations, unjust enrichment, and for attorney fees under OCGA § 13-6-11. The trial court later granted Gee's motion for a directed verdict as to breach of the non-disparagement provision and unjust enrichment claims.

The jury found that Gee breached the non-solicitation clause and the confidentiality/return of materials clauses. The jury also found that each breach had caused damage to Tyler and awarded $375,000 in damages for the breach of the non-solicitation clause and $75,000 in damages for the breach of the confidentiality/return of materials clauses. The jury further awarded $480,000 in attorney fees to Tyler. The jury found DHR and Gee not liable for tortious interference of contract. Gee filed a motion for a judgment notwithstanding the verdict, or in the alternative motion for new trial, which the trial court denied. This appeal from Gee followed.

1. Gee argues that Tyler failed to prove causation. That is, Gee contends that Tyler failed to show that the solicitations caused Maine Medical and NGHS to leave Tyler, and that Tyler would have still received business from Maine Medical and NGHS in Gee's absence.

4

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken."[2] "To prove resultant damages growing out of a breach of contract, they must be such as can be traced solely to the breach."[3] "[T]he injured person is, so far as it is possible to do so by a monetary award, to be placed in the position [it] would have been if the contract had been fully performed."[4]

In August 2017, about two weeks before Gee left Tyler, Tyler offered NGHS a discount because NGHS no longer needed Tyler to continue working on a placement. Debbie Weber, an employee at NGHS, responded to Gee that it was "VERY considerate of Tyler" to offer the discount and that "when the times comes - YOU WILL get the call." In October 2017, when Gee was with DHR, she sent an e-mail to Weber with a presentation from DHR and indicated that Gee "was ready and

---

[2] (Citation and punctuation omitted.) *Norton v. Budget Rent a Car Sys.*, 307 Ga. App. 501, 502 (705 SE2d 305) (2010).

[3] (Citation and punctuation omitted.) *Knaack v. Henley Park Homeowners Assn.*, 365 Ga. App. 375, 382 (2) (877 SE2d 821) (2022); see OCGA § 13-6-1 ("Damages are given as compensation for the injury sustained *as a result of the breach* of a contract.") (emphasis supplied).

[4] (Citation and punctuation omitted.) *American Infoage v. Only Solution Software*, 362 Ga. App. 706, 709 (1) (a) (870 SE2d 47) (2022).

willing to partner" with Weber. After Weber did not respond, Gee sent another e-mail to Weber in November 2017 asking "if anything was cooking" and requested to have lunch with her. Weber responded that NGHS "did not have any roles brewing," but was "glad to have [Gee's] information." Weber indicated that she would "love" to have lunch with Gee in the new year. In January 2018, Gee again e-mailed Weber, stating that Gee would "hate to lose the momentum we had with me working with you and your team" and requested that they have lunch. Gee and Weber scheduled a lunch in May 2018. About two weeks later, a member of Weber's team reached out to Gee and asked her to handle a search for NGHS's director of accounting.

When Gee resigned from Tyler, she was working on a search for the president of Maine Medical. Shortly after joining DHR, Gee received a text from her contact at Maine Medical asking why Gee thought that Maine Medical "would have a different result and better candidates with you [and] your new firm[.]" Gee responded that DHR would "take a different approach to identifying and assessing candidates [than] what has already been done and will be done by [Tyler.]" Gee explained at trial that Maine Medical was contemplating pausing the search for six months and asked Gee how she would handle that.

In October 2017, Gee sent her contact at Maine Medical a presentation from DHR regarding some of the services DHR offered. In November 2017, Gee sent e-mails to Maine Medical's president promoting DHR's healthcare search services. In December 2017, Gee e-mailed Judith West, the chief human resources officer at Maine Medical, reminding West of "the many searches" they had collaborated on and touting the services that DHR could offer. West responded and thanked Gee for reaching out, indicating that West "look[ed] forward to working with [Gee] once again in the future."

In April 2018, Gee again e-mailed West, stating that Gee wished to share what DHR and Gee "could bring to the table" and that Gee wanted "to continue to have a valued relationship with [West] and [West's] team in the future." After Gee communicated with other employees at Maine Medical, West responded in May 2018 to Gee's April 2018 e-mail indicating that West wanted to engage Gee to search for a new chief operating officer ("COO"). Maine Medical later engaged Gee in February 2019 to perform a search for a new chief of cardiac service.

Here, there was sufficient evidence for the jury to find that Gee's solicitations caused Tyler to lose business from Maine Medical and NGHS. Gee sent several e-

7

mails to Weber and West soon after her departure from Tyler. As recounted above, both Weber and West decided to hire DHR in response to those e-mails. Additionally, Tyler presented evidence that, prior to Gee's departure, both companies had been longtime clients of Tyler.

Gee contends that Tyler presented no evidence that Maine Medical and NGHS would have hired Tyler but for her solicitations. She primarily relies on West's testimony, who testified that Gee's solicitations "wouldn't have had any impact" on Maine Medical's decision-making process and that West would typically "ignore" such e-mails. But Tyler presented evidence that West actually responded to Gee's e-mails and that West's request for DHR to perform the COO search came directly in response to one of those e-mails.

Ultimately, when viewed in the light most favorable to the verdict, there was evidence for the jury to conclude that Gee's solicitations caused Tyler to lose business to DHR. The jury could consider the timing of Gee's solicitations, Maine Medical's and NGHS's responses to the solicitations, and Tyler's previous relationship and success with Maine Medical and NGHS.[5] Accordingly, the trial court did not err in

---

[5] Cf. *Boeing Co. v. Blane Intl. Group*, 276 Ga. App. 672, 675 (1) (624 SE2d 227) (2005) (holding that the trial court erred in denying a motion for a judgment

denying Gee's motions for a directed verdict and judgment notwithstanding the verdict on this ground.

2. Gee argues that Tyler failed to prove causation or damages with respect to her alleged breach of the confidentiality and non-retention provisions. She contends that there was no evidence that she ever used the Tyler documents or that Tyler sustained damages as a result of any disclosure.

After Tyler filed the lawsuit, Gee disclosed that she had a "box full of Tyler's documents in [her] basement office." Gee testified that she did not know that the box was in her basement. In addition to the box, Gee disclosed that she had some Tyler documents on a shelf in her home office. The Tyler documents included client and business development target lists. Gee testified that, when she left Tyler, she did not remember all the clients she had been communicating with. Gee did not remember whether she had looked at the client lists in her office. Additionally, the day before Gee left Tyler, Gee printed out and took home her calendar, which contained all of the

notwithstanding the verdict on a tortious interference of contract claim where the plaintiff failed to show that the other companies had even read the defendant's allegedly tortious letters); *Pendley Quality Trailer Supply v. B&F Plastics*, 260 Ga. App. 125, 126-127 (1) (578 SE2d 915) (2003) (affirming trial court's grant of a directed verdict where plaintiff failed to present any evidence as to why its customers left the company).

appointments she had with clients in the past six months as well as her personal appointments.

An expert witness for Tyler testified as to the amount of lost profits Tyler suffered in the case. The expert provided two different methodologies for calculating lost profits. In the "before-and-after" method, the expert used the sales Tyler made to Maine Medical and NGHS for the three years prior to Gee's departure to calculate expected future sales, which yielded lost profits of $587,011. In the second method, the expert calculated the lost profit just from the searches DHR actually performed for Maine Medical and NGHS, which yielded a result of $297,876.

Here, viewed in the light most favorable to the verdict, the jury could find that Gee used Tyler's confidential information to reach out to her client contacts at Maine Medical and NGHS. As recounted above, these confidential documents contained client contacts and target lists, and Gee testified that when she left Tyler she could not remember all of her client contacts. And Gee's communications with these contacts ultimately led to new business for DHR. Thus, there was sufficient evidence for the jury to determine that Gee used confidential information and that Tyler was harmed as a result.

To the extent that Gee challenges the amount of the jury award ($75,000) for breaching the confidentiality provisions, the jury was not required to return a verdict in the precise amounts proven at trial.[6] "In the absence of a verdict form requiring more specificity, the method by which a jury reaches a particular verdict is not a matter of which this Court can take judicial cognizance."[7] Moreover, the jury's damage award, considered with the $375,000 damages for breaching the non-solicitation clause, was supported by expert testimony. "The question of damages is ordinarily one for the jury[,] and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case."[8]

---

[6] See *Gold Kist, Inc. v. Base Mfg.*, 289 Ga. App. 690, 693 (1) (658 SE2d 228) (2008).

[7] (Citations and punctuation omitted.) *Ga. Clinic, P.C. v. Stout*, 323 Ga. App. 487, 492 (2) (747 SE2d 83) (2013); see *Brock v. Douglas Kohoutek, L.P.*, 225 Ga. App. 104, 109 (3) (483 SE2d 342) (1997) ("If the defendants desired an explanation of the basis for the damage award, they should have objected to the verdict form, which allowed the jury free rein to set damages.").

[8] (Citation and punctuation omitted.) *Vineyard Indus. v. Bailey*, 343 Ga. App. 517, 524 (3) (b) (806 SE2d 898) (2017).

For these reasons, the trial court did not err in denying Gee's motions for a directed verdict and judgment notwithstanding the verdict on this ground.

3. Gee argues that, because Tyler should not have prevailed on any of its underlying claims, we should also reverse the jury's award of attorney fees under OCGA § 13-6-11.[9] However, as explained in Divisions 1 and 2, the trial court did not err in denying Gee's motions for a directed verdict and judgment notwithstanding the verdict. As this is the only basis Gee presents to reverse the attorney fee award, we affirm the jury's award of attorney fees.

In summary, the evidence presented at trial supported the jury's findings that Gee's breach of the non-solicitation and confidentiality/non-retention clauses caused Tyler damages. Accordingly, we affirm.

*Judgment affirmed. Doyle, P. J., and Hodges, J., concur.*

---

[9] See OCGA § 13-6-11 ("The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them."); *United Cos. Lending Corp. v. Peacock*, 267 Ga. 145, 147 (2) (475 SE2d 601) (1996) ("A prerequisite to any award of attorney fees under OCGA § 13-6-11 is the award of damages or other relief on the underlying claim.").