**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

July 12, 2012

# In the Court of Appeals of Georgia

A12A0359. RINDSBERG et al v. NEACSU.                XX-000

ADAMS, Judge.

Frank and Steve Rindsberg, individually and as executors of the estate of their mother, sued physicians Sandra Levy and Luminita Neacsu, Eagle Hospital Physicians, LLC, and St. Josephs Hospital of Atlanta, Inc., for medical malpractice and wrongful death. The trial court granted Dr. Neacsu's motion for summary judgment, finding that no doctor-patient relationship existed between Neacsu and Mrs. Rindsberg, and the Rindsbergs appeal. Because an issue of fact exists regarding whether an implied doctor-patient relationship arose between Neacsu and Mrs. Rindsberg, we reverse.

We review de novo a trial court's decision on a motion for summary judgment and look at the evidence in the light most favorable to the nonmovant to determine

whether a genuine issue of material fact exists that a jury should decide. *Wellstar Health System v. Painter*, 288 Ga. App. 659, 660 (655 SE2d 251) (2007).

Construed in favor of the Rindsbergs, the evidence shows that 85-year-old Vera Rindsberg visited the emergency room at St. Joseph's Hospital in Atlanta on February 5, 2009 and again on Saturday and Sunday February 7-8, 2009, with complaints, among other things, of nausea and vomiting. On the second visit, Rindsberg saw an emergency room physician who ordered tests and an x-ray, and Dr. Levy was called to determine if Rindsberg should be admitted to the hospital and for treatment. Levy is a hospitalist[1] employed by Georgia Inpatient Medicine Associates, LLC ("GIMA"), and, in addition to her medical duties, she is the "medical director" of GIMA's practice at St. Joseph's, responsible for administrative duties including scheduling GIMA's hospitalists, who are on duty at St. Joseph's 24 hours a day. Levy saw Rindsberg at 11:30 a.m., took a history, performed a physical examination, and reviewed the x-rays and other tests; based on this information she diagnosed Rindsberg with nausea, vomiting and constipation, and she admitted Rindsberg to the hospital and prescribed medication. On Sunday morning, Levy saw Rindsberg and

_____

[1] The Society of Hospital Medicine defines a hospitalist as "A physician who specializes in the practice of hospital medicine." See http://www.hospitalmedicine.org.

2

found that her symptoms had alleviated; she issued discharge orders just prior to 3:00 that afternoon, although she did not see Rindsberg again after the morning examination.

At about 4:00 p.m., Rindsberg's son Frank, who lives in the Atlanta area, called his brother Dr. Steve Rindsberg, a radiologist in California,[2] to tell him of the decision to discharge their mother and that their mother would be alone at home that evening. Steve was concerned about her being discharged in the evening and going home alone, so at about 5:00 or 5:30 p.m., prior to Rinsdberg's actual departure, Steve called his mother and asked her how she was doing. As a result of that conversation, Steve called the nursing station and asked for Dr. Levy, who was not available, so he spoke to his mother's nurse about her condition. Based on that conversation, Steve was concerned that his mother was not doing well and worried whether she should spend another night in the hospital, although he did not think that her condition was life-threatening. Steve hung up, called the hospital operator, and asked her to page Levy, who did not respond. Steve was eventually given the answering service for Levy's medical group, where he left a message.

---

[2] All references to the time will be in Eastern Standard Time.

Dr. Neacsu, another hospitalist employed by GIMA who was working a late shift, testified that she received a page from GIMA's answering service with a message that the patient's son was concerned about his mother. Neacsu testified that another GIMA doctor was also on duty at the time of Steve's page but that the two of them "pass that pager from one person to another, just to kind of share the responsibilities." After receiving the page, Neacsu called Rindsberg's nurse and asked if anything acute was going on and whether she needed to do something; she also told the nurse to let her know "if anything changes or if you need me." She testified that she then texted Levy, explaining that "Mrs. Rindsberg's son wants to talk to her because he has some concerns about her discharge. . . not being ready for discharge." Neacsu testified that Levy stated in a reply text that the patient was stable for discharge, that she was aware of the situation, and she would call the son at some later time. Neacsu then called Steve back.[3]

Steve testified that after he introduced himself, Neacsu explained that Levy had received his calls and would be calling him the next day. Steve asked Neacsu if she was familiar with his mother's condition. Neacsu replied that she was not but that she

_____

[3] Neacsu also testified, however, to a different sequence of events: that first she spoke to Steve, then the nurse, then exchanged texts with Levy. But the doctor's testimony is construed against her for the purpose of summary judgment.

4

trusted her colleague's medical judgment. Steve added that he had spoken to the nurse and that he understood that his mother's condition had changed, that she didn't look well, that she was uncomfortable, and that the nurse thought she was not doing well. Steve asked Neacsu if she would mind taking a look at his mother and assessing if she thought there had been a change in her condition.

Neacsu responded that she was the doctor on call but that meant she was responsible for admitting patients, not seeing them in the hospital. She then reiterated, "Dr. Levy is my colleague and I trust her medical judgment." Steve continued that he was concerned about his elderly mother going home and being alone so soon after having had an enema (which he understood she had received); he was worried that she was at risk of falling; and he asked if Neacsu thought it was a good idea to keep her overnight. Neacsu responded, "I'm sorry, there's nothing I can do for you. Your mother is being discharged and I trust Dr. Levy's medical judgment." The call ended, leaving Steve astonished that Neacsu had refused to see his mother, although he did not take any further steps to keep his mother in the hospital that night.

Neacsu's testimony about the phone call parallels Steve's. She testified that Steve explained he wanted to get in touch with Levy "[t]o discuss about his mother's conditions, and he was worried about her not being ready to be discharged." She

5

recalled that he was worried that it was late and also worried that her appetite was poor. She admitted that Steve essentially asked her to examine his mother and form her own opinion. She testified that she did not do so because Rindsberg was not her patient, she had notified the attending physician and the nurse, and she had not been requested "by the attending physician, nurse, or the patient to see that patient." She added that Steve had not asked her to "take over the case or remove Dr. Levy from the case."

Steve then called Frank and told him about the conversation. Frank arranged to have a caregiver (not a nurse) stay with their mother that night after her discharge; and Frank picked her up between 8:00 and 8:30 p.m. and took her home where she spent the night with the caregiver. Sadly, paramedics had to be called early the next morning; their report states that "at 4:33 [a. m.] patient had massive vomit and stopped breathing." She died shortly thereafter. There are allegations and factual issues as to whether Rindsberg died from a gastrointestinal condition that should have been detected before she was discharged.

In her deposition, Levy was asked who should be contacted to take care of one of her patients if she was not on duty; she answered "The physician on call for me." And she clarified that she would expect that physician to deal with the medical issue

that is presented without calling her. She does not recall any conversations with Neacsu the day that Rindsberg was discharged. She testified it was plausible that Neacsu sent her a text regarding Steve's call, but she did not recall receiving one. She testified she never spoke with Steve that day and never learned he was concerned that his mother's condition was deteriorating, which was something she would have wanted to know. She testified that if she had been given that information, she would have spoken to him about it and decided what course of action to take.

The plaintiff's expert, Dr. Edward Weissman, opined that Neacsu breached the standard of care when she refused to re-evaluate Rindsberg based on Steve's request and when she refused to countermand the prior discharge order given that Rindsberg was unstable at the time.

"Georgia law is clear that physician-patient privity is an absolute requirement for the maintenance of a professional malpractice action." *Medical Ctr. of Central Ga. v. Landers*, 274 Ga. App. 78, 84 (1) (b) (616 SE2d 808) (2005).

> [B]efore a plaintiff may recover on the theory that he received negligent treatment from a defendant physician, the plaintiff must show that a doctor-patient relationship existed between them. In such cases, called "classic medical malpractice actions" by the Court of Appeals, doctor-patient privity is essential because it is this "relation which exists between physician and patient which is a result of a consensual

7

transaction" that establishes the legal duty to conform to a standard of conduct.

*Bradley Center v. Wessner*, 250 Ga. 199, 201 (296 SE2d 693) (1982). "The relationship is considered consensual [when] the patient knowingly seeks the assistance of the physician and the physician knowingly accepts [her] as a patient." (Citation and punctuation omitted.) *Peace v. Weisman*, 186 Ga. App. 697, 698 (1) (368 SE2d 319) (1988). Such a relationship may also be implied, and we have held that, while a physician's on-call status alone is not enough to find that the physician impliedly consented to a physician-patient relationship, such a "relationship may be found . . . where a physician has done something, such as participate in the patient's diagnosis and treatment, that supports the implication that she consented to a physician-patient relationship." *Anderson v. Houser*, 240 Ga. App. 613, 618 (1) (523 SE2d 342) (1999).

Construing the above evidence in favor of the Rindsbergs would support the following conclusions: (1) that as the on-call doctor for GIMA who received Steve's page, Neacsu was responsible for treating the patient in the absence of Levy; (2) that Neacsu did not learn that Steve thought that his mother's condition was deteriorating until after she had exchanged texts with Levy and spoken to Rindsberg's nurse; (3)

8

that she did not subsequently transfer this information to Levy; and (4) that she refused to examine Rindsberg to investigate whether the information was correct even though she had herself previously contacted Rindsberg's nurse and checked on the patient. In other words, the GIMA doctor assigned the responsibility for treating the patient and who, in fact, had called to check on the patient, failed to take any action whatsoever in response to receiving new information that the attending doctor would have wanted to know for the purpose of treating the patient. Thus, there is an issue of fact regarding an implied physician-patient relationship, as well as liability.

We did not find that the facts in *Anderson*, 240 Ga. App. 613, established a genuine issue in this regard because in that case the defendant doctor, who was the scheduled on-call physician when the plaintiff was admitted to the emergency room, was not in fact performing in that role at the time because he was out of town during the plaintiff's entire hospital stay. Id. at 614-615. Instead, there was a chain of command at the hospital that was supposed to be followed in the event that an on-call physician was not available. Id. at 614. In addition, the defendant doctor never met the plaintiff, was not consulted about the plaintiff, did not have any conversations with anyone about the plaintiff, and "was not aware of her existence." Id. at 615 (1).

9

The case of *Guida v. Lesser*, 264 Ga. App. 293 (590 SE2d 140) (2003), is also factually distinguishable. In that case, the wife of a patient who made an appointment with a cardiovascular doctor for a stress test for her husband based on a referral from his family practitioner, brought suit against the cardiovascular doctor alleging that if the doctor's practice had given her husband an earlier appointment, he might not have died in the interim. But the undisputed facts showed that

> Other than the referral and the telephone conversation with [the decedent's wife] to set up the appointment, there is no evidence that [cardiovascular doctor] or any of his employees had any contact with [the decedent] or that [the doctor] had any information about [the decedent's] medical condition or had rendered any opinion or given any advice about his care and treatment.

Id. at 298.

Here, in contrast, when construed in favor of the Rindsbergs the evidence shows that Neacsu was on duty and on call receiving pages. And even though Neacsu denies it, per the testimony of Dr. Levy, she was responsible for medical treatment of Levy's patients in Levy's absence. She in fact contacted Mrs. Rindsberg's nurse at one point and asked about her condition. Thus, there is some evidence she impliedly agreed to accept Mrs. Rindsberg as a patient, which creates an issue of fact as to

10

whether a physician-patient relationship existed in this case. Accordingly, the trial court erred by granting summary judgment in favor of Neacsu.

*Judgment reversed. Barnes, P. J., and McFadden, J., concur.*