**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 20, 2013**

# In the Court of Appeals of Georgia

A13A1580. CARTLEDGE v. MONTANO et al.

DILLARD, Judge.

In this medical-malpractice action, Emma Cartledge sued Jolene Montano, M.D. and her practice group, Obstetrics and Gynecology Associates of Augusta, P.C. (collectively "Montano"), alleging that she suffered serious injuries as a result of Dr. Montano's negligent performance of an intrauterine surgical procedure. On interlocutory appeal, Cartledge contends that the trial court erred in (1) granting Montano's motion in limine to exclude the testimony of Cartledge's medical expert; and (2) denying her motion in limine to exclude evidence regarding the fact that she had previously undergone abortion procedures. For the reasons set forth *infra*, we reverse the trial court's grant of Montano's motion in limine but affirm its denial of Cartledge's motion in limine.

The record shows that in March 2005, Cartledge was experiencing abnormal uterine bleeding and irregular menstrual cycles and, thus, sought treatment from Dr. Montano, an obstetrician/gynecologist. After an ultrasound indicated a possible polyp or fibroid on the interior lining of Cartledge's uterus, Dr. Montano recommended that Cartledge undergo a surgical procedure known as a cervical dilation and uterine curettage ("D & C") with a hysteroscopy. As Dr. Montano explained to Cartledge during an April 2005 appointment, these procedures entail dilating the cervix, distending the uterus with a laparoscopic solution such as Sorbitol, inserting a small scope into the uterus to evaluate its lining, and then scraping the lining to remove the abnormal growth.

On May 4, 2005, Dr. Montano performed the D & C and hysteroscopy and removed what she believed to be a fibroid from the lining of Cartledge's uterus. At the conclusion of this procedure, Dr. Montano noted that approximately 1500 milliliters of the Sorbitol fluid used during the surgery had not been reclaimed after suctioning. And although Dr. Montano was aware that such a deficit between the amount of Sorbitol used during surgery and the amount reclaimed following the procedure could indicate a perforation, in this instance, she believed that the

2

discrepancy was due to the fact that a significant amount of the fluid saturated the drapes covering Cartledge and spilled onto the operating room floor.

After the surgery, Cartledge was discharged from the hospital; however, over the course of the next couple of days she suffered some bleeding and abdominal pain. On May 7, 2005, after experiencing nausea and severe pain in her abdominal area during a bowel movement, Cartledge returned to the hospital emergency room. And following a series of diagnostic tests, two surgeons performed a laparotomy and determined that Cartledge's uterus and bowel had been perforated. In addition, the surgeons discovered necrosed tissue, blood, and nearly two liters of fluid in Cartledge's abdominal area. Consequently, the surgeons repaired the perforations and performed a temporary colostomy to bypass the damaged portion of Cartledge's bowel. Ultimately, Cartledge underwent three additional surgical procedures to reverse the colostomy and completely treat the perforations to her bowel and uterus.

On April 27, 2007, Cartledge filed a medical-malpractice action against Dr. Montano and her practice group, alleging that Dr. Montano's negligent performance of the D & C and hysteroscopy procedures resulted in the perforation of Cartledge's uterus and bowel. With her complaint, Cartledge included the affidavit of Dr. Bruce Halbridge, a medical expert in gynecology and gynecological surgery. And in his

affidavit, Dr. Halbridge averred that he was currently licensed as a practicing obstetrician/gynecologist and opined that Dr. Montano breached the standard of care by, *inter alia*, failing to perform a bimanual examination of Cartledge to determine the position of her uterus before dilating her cervix; failing to sound the uterus to determine its depth prior to dilation; failing to recognize that she perforated Cartledge's uterus; failing to rule out perforation after more than 1000 milliliters of hysteroscopic fluid could not be accounted for at the conclusion of the surgery; and failing to monitor Cartledge for signs of uterine perforation.

Shortly after Cartledge filed her complaint, Montano answered, and during the ensuing discovery, Dr. Montano, Dr. Halbridge, defendant's expert Dr. Dolan, and several of the other doctors involved in Cartledge's treatment were deposed. On September 8, 2010, Montano filed a motion in limine seeking to exclude portions of Dr. Halbridge's testimony that allegedly exceeded the scope of his expertise. Cartledge responded, and shortly thereafter, she filed a motion in limine seeking to exclude any testimony regarding the fact that she had previously undergone several abortions. But as of September 2012, approximately one month before the matter was scheduled to be tried, the trial court had not ruled on either parties' motions.

Consequently, on September 15, 2012, Cartledge filed a second motion in limine to exclude any evidence of her prior abortions. And less than two weeks later, Montano filed a second motion in limine regarding Cartledge's expert—this time seeking to exclude all of Dr. Halbridge's testimony. Then, on October 24, 2012, the trial court issued an order granting defendant's motion in limine to exclude Dr. Halbridge's testimony. Specifically, the trial court concluded that Dr. Halbridge was not qualified to testify because he stated during his deposition that he does not perform hysteroscopic removal of fibroids and because his testimony did not rely on the evidence in the record. On the same day, the trial court also issued an order denying Cartledge's motion in limine to exclude evidence of her prior abortions, finding that such evidence was relevant given the testimony of defense witnesses that abortions generally increased the risk of uterine perforation.

Subsequently, the trial court issued certificates of immediate review as to the October 24, 2012 orders, and Cartledge filed an application for interlocutory review, which this Court granted. This appeal follows.

At the outset, we note that any issue regarding the admissibility or exclusion of expert testimony "rests in the broad discretion of the trial court, and consequently,

5

the trial court's ruling thereon cannot be reversed absent an abuse of discretion."[1] Furthermore, we similarly review a trial court's ruling on a motion in limine for an abuse of discretion.[2] And a motion in limine is properly granted when "there is *no circumstance* under which the evidence under scrutiny is likely to be admissible at trial."[3] With these guiding principles in mind, we turn now to Cartledge's specific claims of error.

1. Cartledge contends that the trial court erred in granting Montano's motion in limine to exclude the testimony of Dr. Halbridge on the grounds that he was not qualified under OCGA § 24-9-67.1 (c)[4] to provide an expert opinion on hysteroscopic removal of fibroids and that his testimony was speculative and, therefore, unreliable. We agree that the trial court erred.

---

[1] *Carter v. Smith*, 294 Ga. App. 590, 591 (1) (669 SE2d 425) (2008) (punctuation omitted).

[2] *See Hankla v. Johnson*, 305 Ga. App. 391, 392 (1) (699 SE2d 610) (2010) (punctuation omitted).

[3] *Id.* (punctuation omitted) (emphasis supplied).

[4] Former OCGA § 24-9-67.1 (c), *repealed by* Ga. Laws 2011, Act 52, § 2. OCGA § 24-7-702 (c), which became effective January 1, 2013, contains language identical to former OCGA § 24-9-67.1 (c), but because the provisions of Georgia's new evidence code "apply to any motion made or hearing or trial commenced on or after" January 1, 2013, the prior code applies here. *See* Ga. Laws 2011, Act 52, § 101.

6

The relevant portion of Georgia's expert-witness statute, former OCGA § 24-9-67.1 (c), provides as follows:

Notwithstanding the provisions of subsection (b) of this Code section and any other provision of law which might be construed to the contrary, in professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:

(1) Was licensed by an appropriate regulatory agency to practice his or her profession in the state in which such expert was practicing or teaching in the profession at such time; and

(2) In the case of a medical malpractice action, *had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given* as the result of having been regularly engaged in:

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue . . . .[5]

---

[5] *See* former OCGA § 24-9-67.1 (c) (1), (2) (A) (emphasis supplied).

In construing this statute, the Supreme Court of Georgia has held that "the requirement that the expert have actual professional knowledge and experience in the area of practice or specialty *in which the opinion is to be given* means that the plaintiff's expert does not have to have knowledge and experience in the same area of practice/specialty as the defendant doctor."[6] Rather, the issue is whether "the expert has knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries."[7] More generally, under the Supreme Court of the United States's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[8] expert testimony is only admissible if it is both: "(1) relevant and (2) reliable, and an expert opinion is 'relevant' if it will assist the trier of fact to understand the evidence or to determine a fact in issue."[9] And disputes as to an expert's credentials are "properly explored

---

[6] *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007) (punctuation omitted); *accord Mays v. Ellis*, 283 Ga. App. 195, 197 (1) (a) (641 SE2d 201) (2007); *Cotten v. Phillips*, 280 Ga. App. 280, 284 (633 SE2d 655) (2006).

[7] *Nathans*, 282 Ga. at 806 (1) (punctuation omitted).

[8] 509 U.S. 579 (113 SCt. 2786, 125 LE2d 469) (1993).

[9] *Cotten*, 280 Ga. App. at 286 (punctuation omitted); *see also Daubert*, 509 U.S. at 589 (II) (B). We note that former OCGA § 24-9-67.1 (f) provides: "It is the intent of the legislature that, in all civil cases, the courts of the State of Georgia not

8

through cross-examination at trial and go to the weight and credibility of the testimony, not its admissibility."[10]

In the case *sub judice*, Cartledge's medical expert, Dr. Halbridge, testified that he has been board certified in obstetrics and gynecology for over 30 years and that he is familiar with the standard of medical care relevant to D & C, hysteroscopic procedures, and intrauterine bleeding. Additionally, Dr. Halbridge testified that as part of his medical practice he performs one or two D & C procedures per week and approximately two hysteroscopies per month. Dr. Halbridge further testified that he did not perform fibroid removal during hysteroscopic procedures, explaining that most of his patients have "large fibroids and they would not be suitable and could not be removed through the scope doing a D & C." But he added that as part of his practice he does "remove polyps through the scope."

Seizing on this testimony, the trial court ruled that Dr. Halbridge was not qualified to offer his opinion in this case because he admitted that he did not perform

be viewed as open to expert evidence that would not be admissible in other states. Therefore, in interpreting and applying this Code section, the courts of this state may draw from the opinions of the United States Supreme Court in *Daubert* . . . and other cases in federal courts applying the standards announced by the United States Supreme Court in these cases."

[10] *Cotten*, 280 Ga. App. at 286.

hysteroscopic fibroid removal, which was the procedure allegedly at issue here, and, therefore, did not possess the experience required by the statute. However, Dr. Halbridge testified that he had significant experience in removing polyps through hysteroscopic procedures, and we can find no evidence in the record, or in the trial court's order granting Montano's motion in limine, indicating that the removal of fibroids via D & C and hysteroscopy is markedly different from the removal of polyps via such procedures. In fact, the evidence in the record belies the contention that the difference between these two surgical procedures is significant. Specifically, Dr. Montano testified that she decided on D & C with hysteroscopy as treatment for Cartledge based on the ultrasound indicating "the possibility of a blood clot or polyp." Her preoperative diagnosis for Cartledge documented in her operative report echoed this uncertainty stating, "[d]ysfunctional uterine bleeding, pelvic pain, and questionable endometrial fibroid or polyp." It was only after the surgery was completed that Dr. Montano opined that she removed a fibroid rather than a polyp—an opinion that may be incorrect according to Montano's own expert witness. Indeed, when testifying regarding his experience performing the procedures at issue, Montano's expert made no distinction between the manner in which he removes

10

fibroids versus polyps through hysteroscopic procedures. Thus, the trial court's finding is based on a distinction without a difference.

Moreover, even if there was evidence in the record indicating that removing fibroids via D & C and hysteroscopy is a markedly different procedure than removing polyps via that same method, "this Court has concluded that the statutory 'area of practice or specialty in which the opinion is to be given' is dictated not by the apparent expertise of the treating physician, but rather by the allegations of the complaint concerning the plaintiff's injury."[11] Thus, it is essential that the expert "have actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given."[12]

Here, Cartledge's complaint alleges that Dr. Montano did not perform a bimanual examination or sound the uterus prior to dilating her cervix, which resulted in her injury during the surgery. In support of Cartledge's contentions, Dr. Halbridge opined that Dr. Montano's failure to perform these examinations led to her perforating Cartledge's uterus while dilating the cervix. And there was sufficient evidence in the record to find that Dr. Halbridge possessed the requisite knowledge

---

[11] *Mays*, 283 Ga. App. at 198 (1) (b) (punctuation omitted).

[12] *Cotten*, 280 Ga. App. at 284 (punctuation omitted).

and experience under OCGA § 24-9-67.1 (c) to offer opinions on these specific issues.[13] Accordingly, we conclude that the trial court abused its discretion in granting Dr. Montano's motion in limine on the ground that Dr. Halbridge lacked the knowledge and experience required to testify in this matter.

Furthermore, we agree that the trial court likewise erred in excluding Dr. Halbridge's testimony on the ground that it was unreliable. As previously noted, "[u]nder *Daubert*, expert testimony is only admissible if it is both: (1) relevant and (2) reliable, and an expert opinion is 'relevant' if it will assist the trier of fact to understand the evidence or to determine a fact in issue."[14] And in his deposition, Dr. Halbridge opined that Dr. Montano failed to perform a bimanual examination to determine the position of Cartledge's uterus and also failed to sound the uterus to determine its depth, and that these failures resulted in her perforating Cartledge's

---

[13] *See Mays*, 283 Ga. App. at 198-99 (1) (b) (holding that because ultimate issue was whether obstetrician/gynecologist misdiagnosed plaintiff's pancreatitis, gastroenterologist had the requisite knowledge and experience in the area of practice or specialty in which his opinion was to be given and, thus, was qualified to testify); *Cotten*, 280 Ga. App. at 287 (holding that ultimate issue was not whether orthopedic surgeon negligently performed surgery, but whether he negligently failed to assess plaintiff's vascular issues and, therefore, vascular surgeon was qualified to testify).

[14] *Cotten*, 280 Ga. App. at 286 (punctuation omitted); *see Daubert*, 509 U.S. at 589 (II) (B).

uterus. The trial court ruled that this testimony was unreliable and speculative because Dr. Halbridge ignored Dr. Montano's testimony, in which she claimed that she did, in fact, perform a bimanual exam and sound Cartledge's uterus prior to surgery.

But the appropriate standard for assessing the admissibility of the opinion of an expert is "not whether it is speculative or conjectural to some degree, but whether it is wholly so."[15] And where evidence in the case allows a reasonable inference to be drawn by the expert witness, "the expert may render an opinion for the jury to weigh."[16] Indeed, *Daubert*'s role of "ensuring that the courtroom door remains closed to junk science is not served by excluding testimony such as [this expert's] that is supported by extensive relevant experience[, and s]uch exclusion is rarely justified in cases involving medical experts . . . ."[17]

And here, while it is certainly true that Dr. Montano testified that she performed a bimanual examination and that she sounded Cartledge's uterus prior to performing the hysteroscopic surgery, she also acknowledged that she did not

---

[15] *Layfield v. Dep't of Transp.*, 280 Ga. 848, 850 (1) (632 SE2d 135) (2006).

[16] *Cox v. Allen*, 256 Ga. App. 53, 57 (4) (567 SE2d 363) (2002).

[17] *Cotten*, 280 Ga. App. at 286 (punctuation omitted).

13

document either procedure in her operative notes. Additionally, one of the nurses assisting the surgery could not recall whether or not Dr. Montano performed these procedures. It is in light of this omission by Dr. Montano that Dr. Halbridge opined that she failed to perform these procedures that would have allowed her to determine the position and depth of Cartledge's uterus. Accordingly, Dr. Halbridge's opinion was not wholly based on speculation. And given that the credibility of the expert and the weight to be given to his opinion were "matters to be addressed by the jury[,]"[18] the trial court in this matter abused its discretion in concluding that Dr. Halbridge's testimony was inadmissible.[19]

2. Cartledge also contends that the trial court abused its discretion in denying her motion in limine to exclude evidence that she had previously undergone several

_____

[18] *Layfield*, 280 Ga. at 852 (1); *cf. Whitley v. Piedmont Hosp., Inc.*, 284 Ga. App. 649, 654 (1) (644 SE2d 514) (2007) (holding that "the fact that an expert's testimony may be contradictory goes only to the weight or credibility of the testimony and does not render it inadmissible").

[19] We note that the trial court's order granting Dr. Montano's motion in limine to exclude Dr. Halbridge's testimony also found that Dr. Halbridge was not qualified to offer medical opinions pertaining to radiology and pathology issues. However, because Cartledge states in her brief that she is not contesting those specific rulings, we need not address them.

abortion procedures. Specifically, she argues that the prejudicial effect of such evidence outweighs its probative value. We disagree.

It is well established that "[e]vidence having a tendency to establish facts in issue is relevant and admissible, and no matter how slight the probative value, our law favors admission of relevant evidence."[20] Thus, even if the evidence offered by a party is "of doubtful relevancy, it should nevertheless be admitted and its weight left to the jury."[21] Nevertheless, a trial court may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury."[22] And when an issue is raised as to whether the probative value of evidence is outweighed by its "tendency to unduly

---

[20] *Martin v. Williams*, 215 Ga. App. 649, 651 (3) (451 SE2d 822) (1994) (punctuation omitted).

[21] *Kilday v. Kennestone Phys. Ctr., L.P.*, 296 Ga. App. 818, 819-20 (1) (676 SE2d 271) (2009) (punctuation omitted); *see Keever v. Dellinger*, 291 Ga. 860, 861-62 (4) (734 SE2d 874) (2012) ("The trial court has wide discretion in determining relevancy and materiality, and furthermore, where the relevancy or competency is doubtful, it should be admitted, and its weight left to the determination of the jury" (punctuation omitted)).

[22] *Sellers v. Burrowes*, 302 Ga. App. 667, 671 (2) (691 SE2d 607) (2010) (punctuation omitted).

arouse the jury's emotions of prejudice, hostility, or sympathy, a trial court's decision regarding admissibility is a matter of discretion."[23]

In this matter, both Dr. Montano and her expert witness testified that abortion procedures can compromise or weaken the uterine wall and render it more susceptible to perforation. Indeed, when questioned as to how the perforation of Cartledge's uterus could have occurred, if not during surgery, Dr. Montano theorized that Cartledge's previous abortions and other surgical procedures could have weakened her uterus to the extent that the perforation resulted from her straining during a bowel movement. And although there is no direct or unequivocal evidence that Cartledge's uterus, in fact, has been compromised by the prior abortion procedures, the radiologist—who conducted the imaging studies on Cartledge after she sought treatment in the hospital's emergency room—testified that he could not examine all the areas of Cartledge's uterus and could not specifically identify the area where the perforation occurred. Thus, as Montano implies, the possibility that a thinning of Cartledge's uterus led to her injury could not be conclusively eliminated. Given these circumstances, we simply cannot conclude that the trial court abused its discretion in

---

[23] *Id.* (punctuation omitted).

16

finding that the probative value of this evidence was not substantially outweighed by any potentially prejudicial effect.[24]

Nevertheless, we certainly recognize that evidence of Cartledge's previous abortion procedures could prejudice her right to a fair trial, and, thus, we take this opportunity to caution the trial court regarding the narrow purpose for which this evidence may be admitted. Specifically, based on this record, this evidence is relevant only for the limited purpose of its potential medical impact, *i.e.*, that the prior abortion procedures could have weakened Cartledge's uterine wall, possibly leading to a perforation that occurred independently from any allegedly negligent act by Dr. Montano.[25] Accordingly, any evidence pertaining to this issue beyond the mere fact

---

[24] *See American Multi-Cinema, Inc. v. Walker*, 270 Ga. App. 314, 319 (4) (a) (605 SE2d 850) (2004) (holding that trial court did not abuse discretion in denying defendant's motion in limine to exclude evidence that its employee's actions toward plaintiff were racially motivated even though there was no direct evidence of such).

[25] It is worth noting here that based on our review of the record, only Dr. Montano opines that Cartledge's previous abortion procedures may possibly have weakened her uterus to the extent that the perforation could have occurred independently and not as a direct result of the surgery. The other physicians who opined on this issue, including Montano's expert, testified generally that abortions *can* cause uterine thinning. Neither party addresses the fact that such evidence may raise an "egg shell plaintiff" issue. *See AT Systems Southeast, Inc. v. Carnes*, 272 Ga. App. 671, 674 (3) (b) (613 SE2d 150) (2005) (holding that "[i]t has long been the rule that a tortfeasor takes a plaintiff in whatever condition he finds him." (punctuation omitted)). Thus, any possible implications pertaining to that issue are not before us.

17

that Cartledge underwent these abortion procedures, that such procedures may cause uterine thinning, and that as a result of those prior procedures the perforation in question may have occurred independently from any alleged negligence, would be substantially prejudicial and, thus, inadmissible.

3. Cartledge further argues that even if the testimony regarding her prior abortions is relevant, she was entitled to a hearing pursuant to OCGA § 24-9-67.1 (d) to determine whether such testimony was scientifically reliable. Again, we disagree.

First, in reviewing the trial court's order on this issue, it is clear that the court considered the relevant physicians' deposition testimony regarding the effect of abortion procedures on the uterus as well, as documentary evidence in support of that testimony, before reaching its conclusion to admit the evidence. Second, OCGA § 24-9-67.1 (d) provides: "[u]pon motion of a party, the court *may* hold a pretrial hearing to determine whether the witness qualifies as an expert and whether the expert's testimony satisfies the requirements of subsections (a) and (b) of this Code section."[26] And in construing the language of a statute, the word "'[s]hall' ordinarily denotes command and not permission, whereas 'may' ordinarily denotes permission and not

---

[26] *See* former OCGA § 24-9-67.1 (d) (emphasis supplied).

command."[27] Thus, we cannot conclude that the trial court was required to conduct a hearing on this issue.[28]

In summary, we hold that the trial court abused its discretion in excluding the testimony of Cartledge's medical expert and, thus, reverse its grant of Montano's motion in limine. But we also find that the trial court did not abuse its discretion in denying Cartledge's motion in limine to exclude evidence pertaining to her past abortion procedures.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and McMillian, J., concur.*

---

[27] *Ring v. Williams*, 192 Ga. App. 329, 330 (2) (384 SE2d 914) (1989); *see* OCGA § 1-3-3 (10).

[28] *See Village at Lake Lanier, LLC v. State Bank & Trust Co.*, 314 Ga. App. 498, 501-02 (2) (b) (724 SE2d 806) (2012) (holding that trial court did not abuse its discretion in denying a motion for a *Daubert* hearing).