**SECOND DIVISION
ANDREWS, P. J.,
MCFADDEN and RAY, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 13, 2014**

# In the Court of Appeals of Georgia

A14A0967. SMITH v. RODILLO.

RAY, Judge.

Glenn Smith sued Eugene S. Rodillo, M. D., a urologist, claiming that Rodillo was professionally negligent in failing to examine Smith after he presented at Elbert Memorial Hospital with symptoms which warranted examination by a urologist, and that he suffered damages as a result. Before trial, the trial court granted Rodillo's motion to exclude certain testimony by Smith's urology expert regarding the causation and permanence of Smith's alleged erectile dysfunction. The trial court then bifurcated the proceedings into an initial trial on the issue of whether a physician-patient relationship existed between Smith and Rodillo, to be followed by a trial on the issue of damages. At the close of Smith's case, Rodillo moved for directed verdict

on the issue of the physician-patient relationship. The trial court granted the motion and then entered judgment for Rodillo.

On appeal, Smith contends that because there was some evidence supporting the existence of a physician-patient relationship between Smith and Rodillo, the trial court erred in directing a verdict in Rodillo's favor. Smith also claims that the trial court erred in excluding portions of his expert's testimony. For the reasons that follow, we conclude that the trial court erred in directing a verdict for Rodillo, and that the trial court's order excluding portions of Smith's expert's testimony must be vacated and the case remanded with direction. Accordingly, we reverse in part and vacate in part.

1. Smith claims that the trial court erred in granting Rodillo's motion for directed verdict because there was some evidence of a physician-patient relationship between Rodillo and Smith. We agree.

A directed verdict is authorized only where the evidence, with all reasonable deductions and construed in favor of the nonmovant, demands a particular verdict. OCGA § 9-11-50 (a). But where any evidence or some evidence exists to support a jury issue on the non-movant's claims, a directed verdict is improper. This Court conducts a

2

de novo review on appeal from the grant of a directed verdict, and we will uphold a directed verdict only if all of the evidence demands it.

(Citations and punctuation omitted.) *Sun Nurseries, Inc. v. Lake Erma, LLC*, 316 Ga. App. 832, 835 (730 SE2d 556) (2012).

The evidence adduced at trial shows that on January 10, 2006, Smith came to the Elbert Memorial Hospital (the "Hospital") emergency room complaining of swelling to his penis and scrotum, difficulty urinating, and chest congestion. ER physician James Barton, M. D., attempted without success to insert a catheter so as to drain Smith's bladder. Barton contacted urologist Rodillo, described Smith's condition, including that Smith had difficulty voiding and was experiencing a fever and chills, and asked if Rodillo would be available to help with the insertion of the catheter. Rodillo recommended that Barton use a Coude catheter, but that if Barton was unable to "get that [in]," he would be available. Rodillo also suggested that Barton order a PSA test. Barton was able to successfully insert the Coude catheter shortly thereafter.

Later that evening, Barton called Smith's family practice physician, Steven Durocher, M. D., and advised Durocher that, in light of Smith's condition, Smith

3

should be admitted to the hospital. Durocher then authorized Smith's admission over the phone. Durocher went to the Hospital the next morning for rounds, and he examined Smith at that time. After concluding that Smith needed to be evaluated by a urologist, Durocher called Rodillo on either January 11 or January 12, 2006. After Durocher presented Rodillo with his findings concerning Smith's physical exam, vital signs, and lab work, Rodillo advised Durocher to order a twenty-four-hour creatinine clearance, renal CT, and nuclear renal flow scan, and Durocher ordered the tests. Durocher testified that he expected Rodillo to come in to examine the patient, and no one informed him that Rodillo was going to be out of the country.

Smith was subsequently diagnosed with Fournier's gangrene, a rapidly developing, tissue-killing disease, and he was treated with, among other things, two debridements to cut away dead tissue, as well as skin grafts to cover the areas where the skin had been destroyed. The Fournier's gangrene diagnosis was made on January 15, 2006, and Dr. Arnold Melman, a urologist who the parties agreed was an expert in the field of urology, opined that if Smith had been seen by a urologist the diagnosis could have been made on January 10, 2006, when Smith came in to the emergency room, or at the latest the next day, and, if so, Smith would probably not have needed the extensive surgery he was later required to undergo. Melman opined that the

4

information provided to Rodillo by Barton, particularly that Smith was also experiencing a fever, constituted a "red flag," which should have prompted Rodillo to come to the Hospital and see Smith.

Rodillo testified that when he spoke with Barton on January 10, 2006, he was scheduled to fly to the Philippines the next day to visit his sick brother. Rodillo was normally on call "24-7" for urological services. According to Rodillo, on the day he spoke with Barton, "all the way through several weeks, the Athens Urology Group is covering for all my urology cases." Rodillo testified that he had also contacted the Hospital and informed the secretary of administration that he would be out of town, and he understood that the Hospital would create a memorandum to that effect and distribute it to the departments of the Hospital and to the physicians practicing in the county. Rodillo could not confirm, however, that such a memorandum was actually distributed by the Hospital.

Although Rodillo had arranged for Athens Urology to take care of any urological problems regarding his patients, Rodillo saw the emergency call from the Hospital and, he explained, "since I'm still in town . . . I answered it to help . . . in case they cannot get hold immediately of . . . Athens Urology." According to Rodillo, Barton asked for advice in inserting the catheter, and he told Barton to use Xylocaine

5

jelly and a Coude catheter. Rodillo acknowledged that he may not have told Barton that he was going out of town. Rodillo did not recall having any conversations with Durocher.

Rodillo further testified that he had never seen Smith and that Smith was not his patient. Rodillo acknowledged, however, that he "had something to do with [Smith's] treatment," that he "had something to do with [Smith's] diagnosis," and that his "ordering those tests or suggesting that those tests be ordered had an impact on Mr. Smith's care."

> It is a well-settled principle of Georgia law that there can be no liability for malpractice in the absence of a physician-patient relationship. In such cases, called classic medical malpractice actions, doctor-patient privity is essential because it is this relation which is a result of a consensual transaction that establishes the legal duty to conform to a standard of conduct. The relationship is considered consensual where the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient.

6

(Citation and punctuation omitted.) *Crisp Regional Hosp., Inc. v. Oliver*, 275 Ga. App. 578, 584 (5) (621 SE2d 554) (2005). See, e.g., *Ussery v. Children's Healthcare of Atlanta, Inc.*, 289 Ga. App. 255, 271 (6) (656 SE2d 882) (2008) ("Georgia law is clear that physician-patient privity is an absolute requirement for the maintenance of a professional malpractice action") (citation, punctuation, and footnote omitted). A physician-patient relationship may be implied, *Rindsberg v. Neacsu*, 317 Ga. App. 269, 273 (730 SE2d 525) (2012), and it can also be established by circumstantial evidence. See *Walker v. Jack Eckerd Corp.*, 209 Ga. App. 517, 524 (3) (434 SE2d 63) (1993).

In this case, Smith, having presented himself "to the emergency room may generally be assumed to have consented to treatment by any physician associated with the hospital who offers such treatment." *Anderson v. Houser*, 240 Ga. App. 613, 619 (1) (523 SE2d 342) (1999). Accordingly, the key issue "in determining the existence of a doctor-patient relationship is whether the physician has knowingly accepted such individual as his patient." Id. In this respect,

> [m]erely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough. Under those circumstances, a doctor is not

7

agreeing to enter into a contract with the patient. Instead, [h]e is simply offering informal assistance to a colleague. At the other end of the spectrum, a doctor who is on call and who, on the phone or in person, receives a description of a patient's condition and then essentially directs the course of that patient's treatment, has consented to a physician-patient relationship. The difficulty arises in determining where, between these two extremes, a physician-patient relationship (and thus a duty) arises.

(Punctuation omitted.) Id. at 618 (1). A doctor does not have to physically examine a patient in order for the doctor-patient relationship to arise. See *Rindsberg*, supra at 273 (where defendant was the on-call doctor for her practice who was responsible for treating the patient in the absence of the attending physician, and had called to check on the patient, but failed to take any action in response to receiving new information that the attending doctor would have wanted to know for purposes of treating the patient, an issue of fact remained as to the existence of an implied physician-patient relationship); *Crisp Regional Hosp.*, supra at 585-86 (5) (finding that where the doctor reviewed the patient's chart, agreed that an MRI was necessary, and ordered

8

the test as an authorized panel physician, the facts were sufficient to support a reasonable inference that, although the doctor had not physically seen or examined patient, the doctor had knowingly accepted him as his patient). Rather, a physician may impliedly consent to a physician-patient relationship "where a physician has done something, such as participate in the patient's diagnosis and treatment, that supports the implication that [h]e consented to a physician-patient relationship." (Citation and punctuation omitted.) *Rindsberg*, supra at 273.

Rodillo contends there is an absence of evidence that he consented to be Smith's doctor because he did not play a major role in Smith's treatment, did not enter orders on Smith's chart, and did not see or promise to see to Smith, but only offered advice to other physicians. Rodillo also maintains that he was not on call on when he spoke with Barton and Durocher, and that although Barton and Durocher were unaware of his travel plans, no one could refute his testimony that he properly notified the Hospital that he would be out of town.[1] We find, however, that a trier of

---

[1] Rodillo also contends that it cannot be refuted that the Hospital issued a memorandum notifying the doctors in the county where he practiced that he was going to be out of town, but he failed to show that he had personal knowledge that such a memorandum was ever issued, or that he, Barton, or Durocher ever saw the memorandum, and no copy of the memorandum was introduced into evidence. But even if we were to assume that such a memorandum existed, it would not change our analysis.

9

fact could conclude that Rodillo's involvement with Smith went beyond offering advice to other physicians, but that he also participated in Smith's diagnosis and treatment.

The evidence showed that Rodillo was the only urologist offering services at the Hospital and that he "get[s] all the urology patients" who elect to stay in the Hospital. Thus, it would have been entirely consistent with Rodillo's medical practice for him to have acted as Smith's urologist given that Smith was a patient at the Hospital and required the assistance of a urologist. Although Rodillo disputes whether he was "on call" when he spoke with Barton, he acknowledged that on January 10, 2006, he was "still in town" and "still the urologist in Elberton." Rodillo further testified that when he saw the emergency call from the Hospital that he answered it, consistent with, a jury might conclude, Rodillo's practice of providing urological services to patients at the Hospital. Although Rodillo knew he was going out of town shortly after he spoke with Barton, he had also arranged for another practice to cover his patients. Thus, Rodillo's travel plans would have not necessarily precluded him from acting as Smith's urologist before he left town.

Notwithstanding that Rodillo answered the emergency call from the Hospital, Rodillo's advice to Barton as to how to successfully insert a catheter into Smith may

10

have been insufficient, standing alone, to constitute evidence that Rodillo had consented to be Smith's doctor. See *Minster v. Pohl*, 206 Ga. App. 617, 618-620 (1) (426 SE2d 204) (1992) (finding that although an emergency room doctor, upon request of a nurse, viewed an x-ray in order to verify whether the nurse had properly replaced the patient's feeding tube, there was no evidence that he did so as the patient's doctor). However, Rodillo's consulations with Barton went further than the insertion of the catheter; he also received a description of the patient's condition and history, and then asked Barton to order a PSA test. A PSA test, according to Barton, is not performed at the hospital and "has to be sent off." Barton testified that he did not ask Rodillo why he asked for the test because Rodillo "[is] the expert." Rodillo acknowledged that in the course of his practice when he is consulted about a patient who he decides to see that he may order tests over the phone through another physician, just like, Rodillo acknowledged, when he talked to Barton.

Melman also testified that someone other than Barton would have had to interpret and act upon the result of the PSA test, which was relevant to diagnose whether Smith had prostate cancer, an infarct, or an infection. As Melman explained:

> The ER doctors, they see the patients in the emergency room. They
> either send them home, or they send them into the hospital. They don't

11

follow them. So there's no point in telling the ER doctor to get a test which is going to take twenty-four or forty-eight hours to get back if he's not going to do anything with it. Someone, presumably the ordering doctor, has to act upon the results of that test.

Similarly, Durocher went over Smith's condition with Rodillo in detail, including "the physical exam, vital signs, [and] lab work," and Rodillo informed Durocher of "some tests that [he] should order." Durocher testified that, in particular, the twenty-four hour creatinine clearance test that Rodillo suggested was not a test he would generally order as a family practice physician.

Viewing the evidence and all reasonable deductions therefrom in favor of Smith, a trier of fact could conclude that Rodillo did not simply offer informal assistance to his colleagues, but that, consistent with his medical practice, by answering the emergency call from the Hospital, conferring with Barton and Durocher as to the patient's condition and history, and then ordering or suggesting specialized tests, he was acting as Smith's urologist. In other words, the evidence is sufficient to show that Rodillo "participate[d] in [Smith's] diagnosis and treatment, [thereby] support[ing] the implication that [he] consented to a physician-patient

12

relationship." (Citation and punctuation omitted) *Rindsberg*, supra at 273. See, e.g., *Crisp Regional Hosp.*, supra at 585 (5) ("Whether a consensual physician-patient relationship existed is generally a factual question for the trier of fact."). It follows that the trial court erred in directing a verdict for Rodillo on the issue.

2. Smith also maintains that the trial court erred in granting Rodillo's motion to exclude Melman's testimony regarding the results of a "Semmes-Weinstein Monofilament Test" (the "Monofilament Test") as they related to the causation and permanence of Smith's erectile dysfunction. We disagree with Smith to the extent he contends that the trial court erred in finding the Monofilament Test unreliable, but we agree with Smith that Melman's opinion as to the cause and permanence of Smith's erectile dysfunction should not be excluded. Accordingly, we vacate the trial court's order granting Rodillo's motion to exclude and remand with direction.

Rodillo moved to exclude Melman's testimony as it related to the causation and permanence of Smith's erectile dysfunction because, he maintained, Melman's conclusions were based on the results of the Monofilament Test, which was an unreliable methodology.[2] Following a hearing, the trial court found that there was no

---

[2] Rodillo's motion to exclude Melman's testimony was filed on July 18, 2013, and our new Evidence Code applies to "any motion made or hearing or trial commenced on or after" January 1, 2013. See Ga. Laws 2011, p. 99, § 101.

13

evidence from Melman that the Monofilament Test was reliable, discounted the literature presented by Smith as failing to support Melman's causation opinion, and concluded that Melman's methodology failed to answer any of the reliability concerns voiced by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (113 SCt, 125 LE2d 469) (1993).[3] The trial court then ruled that Melman "will be prohibited from expressing an opinion regarding the

Accordingly, OCGA §§ 24-7-702 and 24-7-703 governed the motion, notwithstanding that the parties and the trial court relied on former OCGA § 24-9-67.1. We cannot conclude, however, that the differences between the prior law and the current law were material for purposes of the trial court's consideration of the motion.

[3] OCGA § 24-7-702 (f) provides:
It is the intent of the legislature that, in all civil proceedings, the courts of the State of Georgia not be viewed as open to expert evidence that would not be admissible in other states. Therefore, in interpreting and applying this Code section, the courts of this state may draw from the opinions of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *General Electric Co. v. Joiner*, 522 U.S. 136 (1997); *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999); and other cases in federal courts applying the standards announced by the United States Supreme Court in these cases.

14

results of the 'monofilament' test as they relate to the permanence[4] of [Smith's] erectile dysfunction."

The evidence showed that Melman is a urologist with 40 years of experience who specializes in erectile dysfunction, and that he has treated many patients with numbness or decreased sensation in the penis. When Melman examined Smith he found that about half of the skin on Smith's penis had been excised and replaced with a partial thickness skin graft. Melman then performed "quantitative neurosensory testing" and concluded "that [Smith] had absolutely no sensation, zero to touch using [the Monofiliment Test] in the region of his partial thickness skin grafts . . . ." According to Melman, Smith's ability to have intercourse would be impaired because of the absence of sensation on his penis and that the steps that might be taken so that Smith could have a sustained erection would not correct that problem. Melman also opined that Smith's skin debridement and grafting led to scarring, loss of genital sensation, and his loss of sustained erection.

---

[4] Given the trial court's analysis, the underlying motion, and the arguments presented at the *Daubert* hearing, it appears that the trial court intended to exclude Melman's opinion regarding the results of the Monofilament Test as they related to causation as well as to permanence.

15

Melman explained that "testing for sensation . . . is a subjective test" but that "some investigators have set up methods of using . . . devices to make a subjective test as objective as possible." The Monofilament Test, according to Melman, employs "thin fiber[s] made out of plastic of varying diameters" which are placed on an area to be tested for "perceived sensation," and that "you have a number . . . that's related to a specific pressure that the monofilament gives and there are . . . standards of what is normal and what is abnormal." When asked whether the Monofilament Test was generally accepted by urologists, Melman responded, "I don't know the answer to that." Melman acknowledged, however, that "not many urologists do this," that the monofilaments are usually used by a neurologist, and that he was a "trailblazer." He also indicated that he performed the test on Smith because "we published some papers of quantitative neurosensory testing" and, somewhat ambiguously, "I don't know of anyone else who does that."

OCGA § 24-7-702 (b) provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence, an expert may testify thereto if "[t]he testimony is based upon sufficient facts or data," "[t]he testimony is the product of reliable principles and methods," and "[t]he witness has

16

applied the principles and methods reliably to the facts of the case which have been or will be admitted into evidence before the trier of fact." In this respect,

> reliability is examined through consideration of many factors, including whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error for the theory or technique, the general degree of acceptance in the relevant scientific or professional community, and the expert's range of experience and training.

*HNTB Ga., Inc. v. Hamilton-King*, 287 Ga. 641, 642 (1) (697 SE2d 770) (2011). The trial court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." See *Daubert*, supra at 592-593 (II) (B). The burden of showing the reliability of the expert's opinion rests with the proponent of that evidence. See *Butler v. Union Carbide Corp.*, 310 Ga. App. 21, 26 (1) (712 SE2d 537) (2011). And the admission or exclusion of expert testimony is within the broad discretion of the trial court. See *Meacham v. Franklin-Heard County Water Auth.*, 302 Ga. App. 69, 76 (3) (690 SE2d 186) (2009).

17

Turning to the non-exclusive factors relevant to reliability, Smith proffered an article from the Journal of Hand Surgery which shows that the Monofilament Test technique has been tested, and its reliability assessed, in the context of determining touch thresholds in the hand.[5] Thus, it appears that the Monofiliment Test is capable of being tested as a scientific technique. But Smith fails to show that it has been adequately tested in the context of diagnosing erectile dysfunction. In the article that Melman co-authored, the authors acknowledge that they are "the first group to utilize [the Monofilament Test] . . . for assessing neuropathy of the penis" and that their study was limited by the sample.[6] The other publications proffered by Smith do not show that the Monofilament Test has been more than minimally assessed in the context of erectile dysfunction. Nor does there appear to be any known or potential rate of error for the use of the test as employed by Melman.

---

[5] See Jerosch-Herold, *Assessment of Sensibility after Nerve Injury and Repair: A Systematic Review of Evidence for Validity, Reliability, and Responsiveness of Tests*, Journal of Hand Surgery (British and European Volume 2005). The author also observes, however, that, as to the reviewed studies, "none provides unequivocal evidence that touch threshold is predictive of function."

[6] See Bleustein, Arezzo, Eckhold, and Melman, *The neuropathy of erectile dysfunction*, International Journal of Impotence Research (2002).

Although the Monofilament Test is a known technique, it is not generally utilized by urologists. An assessment of reliability permits an "explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community" and "a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." (Citation and punctuation omitted.) *Daubert*, 509 U.S. at 594 (II) (B). The trial court found, and the evidence showed, that the use of the Monofiliment Test is not generally accepted by the urological community and that the use of the test to diagnose erectile dysfunction was Melman's own project. Further, although Smith shows Melman to be an eminently qualified urologist, Melman acknowledged that the Monofilament Test is a technique employed by neurologists. Given our review of the evidence, we find that the trial court did not abuse its discretion in ruling that Melman could not "express an opinion regarding the results of the [M]onfilament[] [T]est" as they related to the cause and permanence of Smith's erectile dysfunction.

We agree with Smith, however, that even if the Monofilament Test was not shown to be reliable, Rodillo did not establish that Melman's opinion as to the cause and permanence of Smith's erectile dysfunction should be excluded to the extent that it was not based on the Monofilament Test. Much of the underlying data on which

Melman relied was derived from his review of Smith's medical records and his examination of Smith, during which he found not only that approximately half of the skin of Smith's penis had been replaced with a skin graft but that the left side of Smith's penis "had a thick fibrotic scarred cord . . . which prevented his penis from elevating in a cephalad position." Although Melman determined through the use of the Monofilament Test that Smith felt nothing where the skin on his penis had been grafted, we cannot conclude that the use of the test rendered Melman's conclusions based on Smith's reported lack of sensation to be without any foundation, notwithstanding that they may lack the imprimatur of objectiveness that the Monofilament Test, if shown to be reliable, might have provided. Melman personally determined through Smith's responses to touches to various parts of Smith's anatomy (asking "do you feel it now?) that Smith reported no sensation. The subjectiveness of the underlying data in that respect, particularly whether Smith provided accurate responses, is not markedly different from aspects of a traditional examination of a patient by a physician and is capable of being challenged through cross-examination of Melman and Smith. See, e.g., *Ga. Dept. of Transp. v. Miller*, 300 Ga. App. 857, 861 (2) (a) (686 SE2d 455) (2009) ("If it be developed that the opinion is based on inadequate knowledge, this goes to the credibility of the witness rather than to the

20

admissibility of the evidence"). Thus, we cannot conclude that Melman, an experienced urologist, may be precluded from opining to the cause and permanence of Smith's erectile dysfunction based on his personal examination of Smith and his review of Smith's medical records. As we have said, "*Daubert*'s role of ensuring that the courtroom door remains closed to junk science is not served by excluding testimony such as [Melman's] that is supported by extensive relevant experience, and such exclusion is rarely justified in cases involving medical experts." (Punctuation and footnote omitted.) *Cartledge v. Montano*, 325 Ga. App. 322, 328 (1) (750 SE2d 772) (2013). *See Kumho Tire Co., Ltd.*, supra at 156 ("[n]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); compare *HNTB Ga., Inc.*, supra at 645 (2) ("experience, standing alone, does not render reliable all opinions an expert may express").

The trial court's order bars Melman from "express[ing] an opinion regarding the results of the [M]onofilament[] [T]est" as they relate to Smith's erectile dysfunction, and in that respect the order is not inconsistent with our analysis as it does not otherwise preclude Melman from expressing an opinion as to the cause and permanence of Smith's erectile dysfunction. On the other hand, Smith's underlying motion, which the trial court granted, suggests that Melman's opinion as to the cause

and permanence of Smith's erectile dysfunction be entirely excluded, and the trial court's order might be interpreted as requiring such exclusion.[7] Accordingly, the trial court's order granting Rodillo's motion to exclude is vacated, and on remand the trial court is directed to enter an order on the motion not inconsistent with this opinion.

*Judgment reversed in part and vacated in part and case remanded with direction. Andrews, P. J. concurs in judgment only and McFadden, J. concurs fully with Division 1 and specially with Division 2.*

---

[7] In his appellate brief, Smith interprets the trial court's order as excluding Melman's entire opinion on the cause of Smith's erectile dysfunction, and Rodillo does not expressly disagree with that assessment.

# In the Court of Appeals of Georgia

A14A0967. SMITH v. RODILLO.

McFADDEN, Judge, concurring specially.

I concur fully in Division 1 of the majority opinion. I do not agree with all that is written in Division 2, but I concur in that division because I understand it to admit the testimony of appellant's expert, a preeminent urologist, "that in effect more than half of [appellant's] penis was totally numb" and to admit his conclusions founded upon that observation.

Asked about his examination, appellant's expert first described appellant's injury then continued,

> I did something that we call quantitative neurosensory testing. It's kind of a sophisticated way of measuring sensation and a few other things, but sensation and vibratory sensation.

> What I found was that he had absolutely no sensation, zero to touch using [the Monofilament Test] in the region of his partial thickness skin grafts of the penis. So that in effect more than half of his penis was totally numb.

Later, as detailed in the majority opinion, the expert explained that "testing for sensation . . . is a subjective test. . . . [I]t's what the patient tells you he does feel or doesn't feel . . . so some investigators have set up methods of using several types of devices to make a subjective test as objective as possible." The test at issue, as he went on to explain, is one such test. It simply applies pressure in precise amounts at precise locations. The patient then reports the resulting sensation or lack of sensation, and his report is recorded. The test, therefore, is merely a refinement of some of the most fundamental methods of medical diagnosis. Because testimony founded on it "rests upon good grounds, [that testimony] should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfacto[rily] weigh its inadequacies." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F3d 1333, 1345 (II) (C) (11th Cir. 2003) (citations and punctuation omitted).

Although the Monofilament Test is apparently capable of drawing fine distinctions, the expert's opinions rest on his observation that appellant "had absolutely no sensation" in the regions of the skin grafts. But even if the expert's opinions did rest on such fine distinctions, arguments that his measurements were "methodologically flawed" would "go to the weight, not the admissibility, of the evidence he offered." Id.